**Robert Glen COE, Appellant,**

v.

**STATE of Tennessee, Appellee.**

Supreme Court of Tennessee,
at Nashville.

March 6, 2000.

Robert L. Hutton, Glankler Brown, Memphis, James Walker, Nashville, William Mark Ward, Shelby County Public Defender's Office, Memphis, Larry Nance (Trial Only), Shelby County Public Defender's Office, Memphis, for Appellant.

Michael E. Moore, Solicitor General, Erik W. Daab, Assistant Attorney General, Nashville, William L. Gibbons (Trial Only), District Attorney General, John W. Campbell (Trial Only), Asst. Dist. Atty. General, Memphis, Glen R. Pruden (Trial Only), Assistant Attorney General, Nashville, for Appellee.

## O P I N I O N

DROWOTA, delivered the opinion of the court, in which ANDERSON, C.J., HOLDER, and BARKER, JJ. joined.

The appellant, death row inmate Robert Glen Coe, challenges on both legal and factual grounds the trial court's order of February 2, 2000, finding that he is presently competent to be executed under *Ford v. Wainwright*, 477 U.S. 399, 106 S.Ct. 2595, 91 L.Ed.2d 335 (1986) and *Van Tran v. State*, 6 S.W.3d 257 (Tenn.1999).[1] We have carefully reviewed de novo each of the legal claims raised by the appellant and conclude that none have merit. In addition, we have thoroughly reviewed the record in this appeal and conclude that the evidence fully supports and does not preponderate against the trial court's finding that the appellant is presently competent to be executed under the standard set forth in *Van Tran*. In *Van Tran*, we explained that "under Tennessee law a prisoner is not competent to be executed if the

prisoner lacks the mental capacity to understand the fact of the impending execution and the reason for it." 6 S.W.3d at 266. Accordingly, we affirm the decision of the trial court.

## I.

### *BACKGROUND*

#### Procedural History

A brief summary of the procedural background of this case is necessary to place the issues in context. In 1981, the appellant was convicted in the Criminal Court of Shelby County of the aggravated rape, aggravated kidnapping, and first-degree murder of an eight-year-old girl, Cary Ann Medlin.[2] For the conviction of first-degree murder, the appellant received a death sentence, and he was sentenced to life imprisonment on each of the other convictions. On direct appeal, this Court affirmed the appellant's convictions and sentences. *See State v. Coe*, 655 S.W.2d 903 (Tenn.1983). The United States Supreme Court denied the appellant's petition for writ of certiorari. *See Coe v. Tennessee*, 464 U.S. 1063, 104 S.Ct. 745, 79 L.Ed.2d 203 (1984). Thereafter, the appellant filed three separate petitions in state court seeking post-conviction relief; however, relief was denied by the state courts in each instance. In 1987, the appellant filed a petition for writ of habeas corpus in the United States District Court for the Middle District of Tennessee. Following an evidentiary hearing, in December of 1996, federal district court Judge John T. Nixon set aside the appellant's convictions and sentences upon finding that several federal constitutional errors had occurred during the appellant's original trial in 1981. In November of 1998, the United States Court of Appeals for the Sixth Circuit reversed the decision of the district court insofar as it had granted the appellant

---

1. Justice Birch filed a separate opinion concurring in part and dissenting in part.

2. For a detailed description of the circumstances of the offense see *State v. Coe*, 655 S.W.2d 903 (Tenn.1983).

habeas corpus relief, and thereby effectively reinstated the appellant's convictions and sentences, *see Coe v. Bell*, 161 F.3d 320 (6th Cir.1998); and the United States Supreme Court denied the appellant's petition for a writ of certiorari. *See Coe v. Bell*, —— U.S. ——, 120 S.Ct. 110, 145 L.Ed.2d 93, *reh'g denied* —— U.S. ——, 120 S.Ct. 567, 145 L.Ed.2d 442 (1999).

After the United States Supreme Court declined to review the case, the State of Tennessee filed a motion in this Court requesting that an execution date be set for the appellant. In response, the appellant asserted his present incompetence to be executed. On December 15, 1999, this Court entered an order finding that the appellant had exhausted the standard three-tier appeals process [3] and, in light of that finding, set the appellant's execution date as March 23, 2000. We also found that the appellant's claim of present incompetence was ripe for determination in light of the imminent execution date and remanded that issue to the Shelby County Criminal Court where the appellant was originally tried and sentenced. We directed that the issue be determined in accordance with the procedures and standard adopted by this Court in *Van Tran*, 6 S.W.3d 257. *See Coe v. State*, 17 S.W.3d 191 (Tenn.1999). As previously stated in *Van Tran*, we held that "under Tennessee law a prisoner is not competent to be executed if the prisoner lacks the mental capacity to understand the fact of the impending execution and the reason for it." 6 S.W.3d at 266.

The appellant filed a petition in the trial court challenging his competency to be executed and attached to the petition the affidavit of Dr. William Davis Kenner, III, a licensed Tennessee physician who practices psychiatry. In his affidavit, Dr. Kenner diagnosed the appellant as schizophrenic and opined that the appellant was not competent to be executed under *Van Tran*. The State filed a response to the petition, contending that Dr. Kenner's affidavit was insufficient to show that the appellant's competency was genuinely in issue and arguing that the appellant had failed to satisfy the threshold showing required by *Van Tran*. *See* 6 S.W.3d at 268. In an order entered January 3, 2000, the trial court, Judge John P. Colton, Jr., found that the appellant had satisfied the required threshold showing that his competency to be executed was genuinely in issue, appointed four mental health professionals, two for each side, to evaluate the appellant, and directed that the reports of the mental health professionals be filed by January 13, 2000. After the reports were filed, an evidentiary hearing to determine the appellant's competency was held, beginning on January 24 and concluding on January 28, 2000. The competency hearing is accurately described in great detail in the trial court's order of February 2, 2000, which is attached hereto as an appendix. However, the proceedings are summarized hereafter.

### Competency Hearing

Testifying first for the appellant was Dr. James Ray Merikangas, M.D., one of the two mental health professionals appointed by the trial court at the request of the appellant pursuant to *Van Tran*. Dr. Merikangas is licensed as a physician in the state of Connecticut and board certified in both psychiatry and neurology. He lectures in psychiatry at the Yale University School of Medicine and practices neuropsychiatry in Connecticut. He was accepted by the trial court as an expert witness in the fields of neurology, neuropsychiatry, and psychiatry.

On direct examination, Dr. Merikangas opined that the appellant has congenital brain damage, maldevelopment, and proba-

---

**3.** The standard three-tier appeals process is exhausted when a petitioner has pursued at least one unsuccessful challenge to his or her conviction and sentence through direct appeal, state post-conviction and federal habeas corpus proceedings. *See Coe v. State*, 17 S.W.3d 191 (Tenn.1999).

bly some acquired brain damage. Dr. Merikangas derived these opinions from his review of the appellant's mental health records, a physical examination of the appellant, a magnetic resonance imaging (MRI) test which revealed abnormalities in the structure of the appellant's brain, and a positron emission tomogram (PET) scan of the appellant's brain.

Dr. Merikangas diagnosed the appellant as a chronic paranoid schizophrenic. Dr. Merikangas based this diagnosis upon his oral interview with the appellant in which he discovered that the appellant has delusions, hallucinations, peculiarities of thinking, and disorders of movement that are symptomatic of schizophrenia. As specific examples of the appellant's conduct which supported his diagnosis of schizophrenia, Dr. Merikangas cited the appellant's decision to stay in his cell rather than exercise with other inmates, the appellant's past "wild" conduct, the appellant's nicotine addiction, the appellant's tendency to drink large amounts of coffee, and the appellant's pariphilia, i.e., tendency to masturbate in public. Dr. Merikangas rejected the possibility that the appellant was malingering mental illness, and described as "junk science" the testing upon which the State's mental health professionals had based their conclusions that the appellant was malingering.

When questioned as to whether the appellant was competent to be executed in accordance with the standard adopted in *Van Tran*, Dr. Merikangas admitted that even though the appellant claims he is innocent and that he is being executed to conceal the identity of the real killer, the appellant is "aware" that he is going to be executed and that he was sentenced to die for the murder of a young girl. However, Dr. Merikangas attempted to draw a distinction between "awareness" and "understanding" and opined that the appellant's beliefs that he will be reincarnated after his execution and return to earth, beliefs which apparently are similar to the those held by writer/philosopher Edgar Cayce,

demonstrate that the appellant does not fully "understand" the consequences of death and that he is not competent to be executed. Dr. Merikangas further opined that the appellant will become even less competent than he is at present as the time of his execution draws near.

On cross-examination, Dr. Merikangas admitted that his personal contact with the appellant consisted of a single visit for a total of ninety minutes during which time he performed both a physical examination of the appellant and conducted an oral clinical interview. With regard to his statements on direct examination that the tests administered by the State's experts were not valid to determine malingering, Dr. Merikangas conceded that Dr. Richard Rogers, one of the foremost experts in the United States on malingering, considers the tests administered by the State's experts to be valid methods for determining malingering. Dr. Merikangas stated that his conclusion that the appellant was incompetent was based upon the fact that the appellant is a paranoid schizophrenic, even though he had testified "you can be schizophrenic and be competent, or you can be schizophrenic and be incompetent." However, Dr. Merikangas professed agreement with the reports of five other mental health experts that the appellant realizes he was sentenced to death for the murder of a young girl.

Testifying next on behalf of the appellant was Dr. William Davis Kenner, III. Dr. Kenner is licensed to practice medicine in Tennessee, employed on the clinical faculty at Vanderbilt University Medical School, and has a private practice of general psychiatry. Dr. Kenner was accepted by the trial court to testify as an expert in the field of psychiatry in this case.

Dr. Kenner had personally interviewed the appellant on four different occasions, December 22, 1999, and January 10, 11, and 12, 2000. On his first visit, Dr. Kenner learned that the appellant sometimes "loses time." As a result of this interview, Dr. Kenner diagnosed the appellant with

schizophrenia and concluded he was not competent. Dr. Kenner gave a sworn affidavit summarizing his opinion which the appellant relied upon in making his initial threshold showing of incompetency. Dr. Kenner was later appointed pursuant to *Van Tran* and conducted a second interview. After this interview, Dr. Kenner was of the opinion that the appellant was competent because he was no longer exhibiting psychotic symptoms. However, when Dr. Kenner arrived for the third interview, the appellant did not remember the previous night's visit. In addition to this memory loss, the appellant gave a history of his childhood wholly inconsistent with the history he had previously given. When Dr. Kenner questioned him about the death penalty, the appellant became agitated and asked to be returned to his cell. As he left the interview, the appellant indicated that he was going to call his attorney, Henry Martin,[4] to determine if Dr. Kenner were telling him the truth about the interview the previous night. As a result of this interview, Dr. Kenner began to suspect that the appellant was suffering from dissociative identity disorder ("DID"), previously called multiple personality disorder.

When Dr. Kenner returned the next day for his fourth and final interview, the appellant produced a letter from another prisoner threatening the appellant with bodily harm if he attempted to obtain a stay of his execution by claiming incompetency. The appellant told Dr. Kenner that he had received the letter the previous evening before Dr. Kenner had arrived. Dr. Kenner testified that the stress caused by the threatening letter had produced the period of separate identity he had observed the previous night. In addition to DID, Dr. Kenner also diagnosed the appellant as suffering from generalized anxiety disorder, schizoaffective disorder (bipolar type), poly-substance abuse, learning disorder, reading disorder, and schizoid personality disorder with antisocial features. Dr. Kenner did not agree that the appellant was malingering, as the State's mental health professionals had concluded, and further opined that the tests upon which the conclusion of the State's experts was based were not effective tools to test malingering in death row inmates. When questioned about his diagnosis and the effect DID might have on the appellant's competency, Dr. Kenner explained that the appellant's condition vacillates depending on stress levels so that, on a good day, the appellant is competent, but on a bad day, when his stress level is high and he is in a dissociated state, the appellant would not be competent to be executed. Dr. Kenner opined, to a reasonable degree of medical certainty, that as the execution date approaches, the stress resulting from the impending execution will cause the appellant to dissociate and will render him incompetent to be executed.

On cross-examination, Dr. Kenner admitted that he considers the appellant to be a manipulative person and that he felt obliged to advise Dr. Merikangas of the appellant's manipulative tendencies. Dr. Kenner also admitted that the appellant had lied to numerous treating mental health professionals in the past and had boasted that he [appellant] could manipulate mental health experts to believe anything he wanted them to believe. However, Dr. Kenner maintained that the confusion and loss of memory he had observed in the appellant was genuine. Dr. Kenner explained that a person suffering from DID has both a primary and a secondary identity. The secondary identity is manifested when the primary identity is under stress, but the secondary identity, according to Dr. Kenner, has "no awareness of the primary identity, any of the primary identity's past history, why he is on death row, what is about to happen to him, anything like that." As the

---

**4.** Henry Martin is the Federal Public Defender and is representing the appellant on his claims in federal court.

trial court noted, Dr. Kenner did not explain how the appellant's "secondary identity" was aware of the names of the attorneys representing his "primary identity" as well as the legal claims his "primary identity" had pending in federal court. Finally, Dr. Kenner conceded that on his fourth and final visit the appellant was competent to be executed under the standard adopted in *Van Tran*, although Dr. Kenner opined that the appellant will likely dissociate and become incompetent in the future. At the conclusion of Dr. Kenner's testimony, the appellant rested his "case-in-chief."

As its first expert witness, the State called Dr. Daryl Bruce Matthews, M.D., Ph.D., one of the two mental health professionals appointed by the trial court in accordance with *Van Tran.* Dr. Matthews is licensed to practice medicine in Hawaii and Arkansas, board certified in psychiatry and forensic psychiatry, and a clinical professor of psychiatry at Hawaii School of Medicine. He was accepted by the trial court as an expert witness in the field of forensic psychiatry.

Dr. Matthews spent almost five hours conducting a psychiatric evaluation of the appellant. He obtained a detailed psychiatric history, which included inquiries about many different life areas, conducted a mental status examination, which included an assessment of the appellant's current mental functioning, and questioned the appellant extensively regarding his knowledge of his impending execution and the reason for it. During this evaluation, the appellant told Dr. Matthews that he remains in his cell and chooses not to take exercise with the other inmates because he fears the other inmates have contempt for the offense committed by the appellant. When questioned about his understanding of death, the appellant told Dr. Matthews that he knows the difference between life and death and that he believes he has a soul and that his soul will go somewhere after death. The appellant also expressed an interest in donating his organs after his death, specifically his eyes. The appellant professed a belief in reincarnation and said that his beliefs are consistent with those of Edgar Cayce, although he did not "get" his beliefs from Cayce. Dr. Matthews explained that Cayce is a famous American prophet who died in the 1940s after writing scores of books and selling millions of copies of his books. When questioned about his execution, the appellant said that he believes he will be executed, and he told Dr. Matthews that he was given a paper and asked to select a method of execution and that he had chosen the "needle." The appellant said that his lawyers became angry with him when they learned he had chosen a method of execution because they [his lawyers] had told him not to sign any papers. Referring to his lawyers' instructions, the appellant said that he was a grown man and could sign anything he wanted. With regard to his competency hearing, the appellant indicated that he understood a hearing was going to be held, but he did not wish to attend. When questioned about the effect of a finding of incompetence, the appellant said, "they give you drugs to make you well and then they kill you."

Dr. Matthews testified that the appellant was aware that he had been convicted of killing a young girl, but that the appellant both minimized the seriousness of the offense, stating that people get murdered all the time, and professed his innocence of the crime, stating that the crime was actually committed by a man named Donald Gant. As examples of proof of his innocence, the appellant cited claw marks on Donald Gant's face and previous arrests of Donald Gant for "messing around with kids." The appellant also told Dr. Matthews that his confession had been coerced.

Dr. Matthews diagnosed the appellant as suffering from pariphilia, i.e., masturbating in public, poly-substance dependence in a controlled environment, adjustment disorder with mixed anxiety and depressed mood, nicotine dependance,

malingering, possible neuroleptic-induced Parkinsonism, noncompliance with medical treatment, antisocial personality disorder, borderline personality disorder, and schizotypal personality disorder. Dr. Matthews disagreed with the diagnosis of schizophrenia, citing both the lack of documented delusional thoughts by the appellant and the diagnosis of Dr. Herbert Meltzer, one of the foremost experts in the United States in the area of schizophrenia, who did not find evidence of schizophrenia in the appellant. Dr. Matthews also strongly disagreed with the diagnosis of DID. Finally, Dr. Matthews opined that the appellant is competent because he understands that he is going to be executed and the reason why he is going to be executed in accordance with the standard adopted in *Van Tran.*

On cross-examination, Dr. Matthews admitted that he had not treated a schizophrenic patient since 1990 and that he had never treated a patient with DID. In fact, Dr. Matthews admitted that he was skeptical about and questioned the existence of DID in general. Finally, Dr. Matthews admitted that the appellant possibly could become psychotic in the future as a result of his borderline personality disorder, substance abuse, or faking. Dr. Matthews was not questioned on cross-examination as to the appellant's present competency to be executed.

The next witness was Dr. Daniel A. Martell, Ph.D., the State's second mental health professional appointed by the trial court pursuant to *Van Tran.* Dr. Martell is licensed to practice psychology in New York and California, board certified in forensic psychology and neuropsychology, and he was accepted by the trial court as an expert witness in the field of psychology.

Dr. Martell had observed, interviewed, and tested the appellant for approximately nine and one-half hours over two days, January 8 and 9, 2000. Five hours of this time was devoted to a forensic psychiatric interview of the appellant. In addition, Dr. Martell had reviewed many documents pertaining to the appellant, including the reports of the mental health professionals participating in the competency hearing, reports from mental health professionals who had treated the appellant in the past, records of the appellant's personal history, and transcripts from the appellant's 1996 federal habeas corpus proceeding.

Dr. Martell testified that during his interview, the appellant was oriented to the world around him, was able to accurately describe his own identity, his location, the month and year, although he was not sure of the exact day of the month. Dr. Martell reported that the appellant expressed his thoughts in a coherent, goal-directed, and logical manner, although his thought content appeared paranoid at times. To Dr. Martell, the appellant denied having visual hallucinations, but professed to experience both auditory and olfactory hallucinations. At the time of his evaluation Dr. Martell found no evidence that the appellant was psychotic although he opined that the appellant is a manipulative and psychopathic individual.

Dr. Martell concluded that the appellant was malingering mental illness. He based his opinion in part upon the results of some of the psychological tests he had administered. On cross-examination, the appellant's counsel attacked the validity of the tests Dr. Martell had administered and specifically attempted to show the questions were irrelevant and absurd when applied to a person on death row. While Dr. Martell admitted on cross-examination that some of the questions were not appropriate for a death row inmate, he maintained that, taken as a whole, the tests were generally accepted in the field of psychology as valid methods of detecting malingering.

Dr. Martell opined that the appellant was competent to be executed in accordance with the standard adopted in *Van Tran.* With regard to the appellant's capacity to understand the fact of his im-

pending execution, Dr. Martell testified that the appellant understands that he is going to be executed, that he has already chosen lethal injection as the method by which he will be executed, and that he has refused the prison officials' offer to give him Valium to sedate him prior to his execution, stating, "I think there might be a God, and I've got enough to deal with with him, without being drunk on Valium." With respect to the reason for his impending execution, the appellant told Dr. Martell that he had been sentenced to death for the murder of a young girl whose name he could not remember. The appellant claimed that he was not guilty of the crime, and, citing several pieces of evidence, he attributed the crime to another man, Donald Gant. The appellant expressed displeasure to Dr. Martell with his lawyers' efforts to prove him incompetent and said they should focus on proving his innocence.

At the conclusion of Dr. Martell's testimony, the State rested its case, and, in rebuttal, the appellant called Dr. John Pruett, M.D. Board certified in psychiatry and licensed as a psychiatrist in Tennessee, Dr. Pruett had been an attending physician at the Riverbend Maximum Security Institution from 1994 to 1997. During his tenure at Riverbend, Dr. Pruett had seen the appellant once every two to three months. While Dr. Pruett testified that DID is a legitimately recognized mental disorder, he stated that he had only seen one patient with the disorder and that the changes in the appellant observed by Dr. Kenner could be consistent with DID. On cross-examination, Dr. Pruett admitted that he most likely would not diagnose the appellant with DID. Dr. Pruett stated that the appellant's symptoms are consistent with both a number of mental disorders and with malingering. Finally, Dr. Pruett did not offer an opinion as to the appellant's present mental competency to be executed.

The appellant next called Dr. James Walker, a clinical assistant professor of neurology at Vanderbilt University School of Medicine. Dr. Walker is licensed to practice psychology in Tennessee. He was accepted by the Court as an expert witness in the field of forensic neuropsychology.

Dr. Walker testified that he had examined the appellant on December 23 and 24, 1999. During his examination, Dr. Walker administered to the appellant almost exactly the same battery of tests that were given by Dr. Martell. In addition, Dr. Walker conducted a two to three hour interview, during which the appellant reported his own history of drug abuse and recounted the physical and sexual abuse he had suffered at the hands of his father during his childhood. Dr. Walker noted that during this interview, the appellant was alert and oriented to self, year, season, month, weekday, location and situation, but not date. Although the appellant was markedly anxious, Dr. Walker found that the appellant's speech was fluent and that his speech content did not reflect delusions or obsessions. The appellant did not report to Dr. Walker any unusual ideas, but, instead, he used every opportunity during the interview to proclaim his innocence of the crime for which he had been convicted and to describe how he had been treated unfairly by the criminal justice system.

Although the results of the psychological tests he had administered to the appellant were similar to the results obtained by Dr. Martell, Dr. Walker testified that he did not interpret the test results to suggest malingering. Dr. Walker explained that to conclude a patient is malingering, a psychologist must be able to determine that the patient is *both* answering the questions falsely *and* doing so with the conscious objective of avoiding some harm or gaining some benefit. Although Dr. Walker testified that the appellant "was exaggerating rare and unusual symptoms to such an extent that he invalidated the tests," Dr. Walker could not detect that the appellant had any motivation to avoid execution; therefore, Dr. Walker could not conclude

that the appellant met both prongs of the malingering definition. As further evidence that the appellant was not malingering, Dr. Walker pointed out that the appellant consistently denied that he had any psychosis and took every opportunity to build himself up in the eyes of the interviewer.

Although Dr. Walker stated that he would not diagnose the appellant with DID, he characterized all the various diagnoses given to the appellant by the other mental health professionals as reasonable. Dr. Walker found that the appellant is not currently psychotic and stated that the appellant's mental health records dating back to 1996 include no clear indications of psychotic thinking or behavior, although the records contain consistent complaints of insomnia, anxiety, and urges to constantly masturbate. Dr. Walker stated that the appellant has schizotypal, antisocial, and narcissistic personality features and opined that the appellant's tendency to lie can best be explained by a diagnosis of pseudologica fantastica, a condition that is associated with borderline personality disorder but which is not found in schizophrenics.

Dr. Walker declined to express an opinion as to whether the appellant met the *Van Tran* standard of present competency because competency to be executed was not his area of expertise. However, on cross-examination Dr. Walker stated that the appellant is aware that his execution is pending, understands the legal system, including the role of the judge and the role of his attorneys, remembers his trial and the legal proceedings since his trial, and can explain most of the issues involved in his case. Finally, Dr. Walker testified that the appellant is aware that he was accused and convicted of a crime and that the death penalty has been imposed for the crime. Dr. Walker disagreed with Dr. Kenner's assertion that the appellant's mental state will deteriorate as his execution date approaches. In an effort to test the appellant's mental state, Dr. Walker

and the appellant had discussed the impending execution in unpleasant detail, and the appellant had exhibited no mental deterioration as a result of the discussion. Although he could not definitively rule it out, Dr. Walker opined that the approach of the execution date is not likely to produce a psychotic deterioration.

Although he did not testify at the hearing, the trial court also relied upon the report of Dr. Herbert Meltzer, which had been submitted to the trial court. Dr. Meltzer is a psychiatrist at the Psychiatric Hospital at Vanderbilt who specializes in the study of schizophrenia. In forming his diagnosis and opinions, Dr. Meltzer conducted an oral interview with the appellant, reviewed the appellant's medical records from 1975–1981, communicated with Dr. Walker, and reviewed Dr. Walker's written report. Dr. Meltzer reported that during the interview the appellant exhibited no disorganization of speech nor any bizarre delusions and that the appellant was able to listen to his questions and make responsive comments. Given his level of education and intelligence, Dr. Meltzer reported that the appellant was remarkably lucid about his inner feelings and preferences. In addition, Dr. Meltzer reported that the appellant does not currently meet the criteria for schizophrenia and instead diagnosed the appellant as suffering from generalized anxiety disorder, mild dementia of unknown etiology, compulsive masturbation, and possibly borderline personality disorder. Finally, Dr. Meltzer opined that the appellant is aware that he is facing imminent execution for the crime of which he was convicted, that the appellant understands the nature of the crimes for which he was convicted, although the appellant denies he is guilty of the crimes, and that he prefers to die rather than to live as he currently lives because he believes he cannot obtain clemency or a new trial.

In addition to the mental health expert proof summarized above, both the appellant and the State offered the testimony of

lay witnesses. As the trial court recognized, none of the lay witnesses offered an opinion as to the appellant's present mental competency to be executed. The lay witnesses testifying on behalf of the appellant described specific instances, in both the distant and the recent past, when the appellant behaved in an unusual or bizarre manner. In contrast, the lay witnesses testifying on behalf of the State described the appellant as a model prisoner who behaved normally.

Although the appellant did not testify, he was present at the competency hearing and the trial court was able to observe his conduct. From the very beginning of the hearing, the appellant made inappropriate comments to the trial judge and to other court personnel, and engaged in generally disruptive behavior. However, on the third day of the hearing, the day on which the State was scheduled to begin presenting proof, the appellant entered the courtroom, turned to the gallery, and directed the following statement to the victim's mother, "I ain't doing this to disrespect you all, but I ain't staying here no more. You can either send me back or we're just going to have some problems now."

True to his word, the appellant began to scream obscene and profane comments and threats at the judge, judicial staff, the State's witnesses, the State's attorneys, and his own attorneys. Although interspersed with profanity, the appellant's comments were logical, coherent, and responsive to the happenings in the courtroom. As the trial judge noted, the appellant was aware of his situation and of what was going on around him so that he was able to interject his own responses to questions asked of the witness by counsel before the witnesses were able to respond. After the appellant insulted and began spitting on Assistant Attorney General Glen Pruden, the trial court directed the security officers to place a gag on the appellant, but the gag proved ineffective. In fact, the appellant's disruptive conduct seemed to grow worse and almost totally impeded presentation of the State's proof. Eventually, the trial court determined that the appellant had waived his right to be present in the courtroom. A separate room was prepared with a closed circuit television to allow the appellant to view the proceedings. The trial court directed one of the appellant's attorneys to accompany him to the room. Once the appellant was removed to the separate viewing room, he made no more outbursts.

The trial court eventually determined that several of the appellant's comments were particularly relevant to the competency determination because the comments illustrated the appellant's awareness. For example, speaking to the trial judge, the appellant stated, "You better send me back to Riverbend.... I didn't ask to come here in the first place.... You want to know if I'm crazy, you should have asked me ....," and, "You know goddamn well you're going to tell them ain't nothing wrong with me so what the ... you waiting for?" The appellant also stated, "Old Judge Nixon is going to fuck your ass up punk. Everything you say and do is going to get overturned. This is a waste of ... time and money here.... You just wanted to be on TV." Again addressing the trial judge the appellant stated, "You just going to let that federal judge overrule your ... ass. That's all you're doing," and, "Hey, don't worry about it. Judge Nixon is going to overturn anything that punk says. And he knows it, too." Finally, the appellant stated, "... Judge Colton ... you know the federal court's going to over turn your ass .... [n]o matter what you rule...." The trial court noted that the appellant was referring to Judge John T. Nixon, a judge for the United States District Court for the Middle District of Tennessee, who, in 1996, granted the appellant habeas corpus relief, and who had issued an opinion ten days prior to the beginning of the appellant's competency hearing holding that the appellant could pursue his competency to be executed claim in federal court following the conclusion of the state

court hearing. The appellant also made reference to the trial judge who presided over his initial trial in 1981, calling him by name.

At the conclusion of the competency hearing, the trial court took the case under advisement, and issued a comprehensive and detailed order on February 2, 2000, finding that

> [t]hroughout all the testimony given, one fact has been constant; the Petitioner realizes he is facing execution, and that he knows it is because he has been convicted of murdering a little girl. Although he maintains his innocence, it has been made quite clear to this Court that Petitioner understands that he was found guilty of the murder and was sentenced to die. Furthermore, even in light of the myriad of mental health diagnoses given Petitioner, the fact that Petitioner knows he is facing execution for the murder of a young girl was reported by each and every mental health expert. In light of this fact, this Court has no choice but to find that Petitioner is competent to be executed, in accordance with the standard set forth in *Van Tran*.

For the reasons that follow, we affirm the decision of the trial court.

5. Regardless of this Court's agreement or disagreement with the holding of the United States Supreme Court in *Ford*, that a death-sentenced prisoner has an Eighth Amendment right not to be executed while insane, we are bound by that holding and must afford this prisoner the rights to which he is entitled under the United States Constitution.

6. At the time the decision in *Ford* was rendered, the procedure for determining competency in Florida was conducted wholly within the executive branch. When the issue was raised, the statute required that the Governor appoint a panel of three psychiatrists to evaluate the prisoner. Under the statute, the Governor made the final decision on whether or not the prisoner was competent to be executed. The Governor had a publicly announced policy of excluding all advocacy on the part of the prisoner from the process of determining whether the prisoner was competent. *Ford*, 477 U.S. at 412–13, 106 S.Ct. at 2603–04. In

## II.

### CONSTITUTIONAL DUE PROCESS

The appellant raises numerous challenges to the procedures employed before, during, and after the hearing, and argues that these procedures deprived him of the due process which is required by both *Ford* and *Van Tran*. The State in response says that the appellant's claims that he was denied due process are without merit.

To properly analyze the specific issues advanced by the appellant, we must briefly review the purpose and nature of competency proceedings and the procedural rights which are due prisoners in competency proceedings. We necessarily begin this review with *Ford*, in which the United States Supreme Court held that the "Eighth Amendment prohibits a State from carrying out a sentence of death upon a prisoner who is insane." 477 U.S. at 409–10, 106 S.Ct. at 2595.[5] That portion of Justice Marshall's opinion garnered a majority of the Court. Although a majority of the justices in *Ford* agreed that the procedures utilized in Florida were inadequate,[6] there was no majority opinion delineating the procedures the States must apply to resolve claims of insanity by prisoners facing execution. Furthermore, the *Ford* majority failed to articulate the legal

*Ford*, the Governor appointed three psychiatrists who performed their evaluation together in a single thirty minute interview, in the presence of eight other people, including Ford's counsel, the State's attorneys, and correctional officials. In accordance with the Governor's policy, the attorneys were specifically precluded by the Governor's order from participating in the examination in any adversarial manner. The psychiatrists each filed a separate two or three page report with the Governor. Although the psychiatrists disagreed on the precise diagnosis, they all opined that Ford was competent to be executed. Ford's counsel attempted to submit to the Governor some other written materials, including the reports of the two other psychiatrists who had examined Ford at greater length, but the Governor's office refused to inform counsel of whether the submission would be considered. *Id.*

definition of insanity in the execution context.

Justice Marshall, joined by three other justices, set out three primary procedural features that states must employ: (1) the prisoner must be allowed to participate in the truth-seeking process; (2) the prisoner must be given an opportunity to clarify or challenge the state experts' opinions or methods; and (3) the ultimate decision must be entrusted to a neutral and impartial officer or body rather than the governor of the state whom Justice Marshall described as "[t]he commander of the State's corps of prosecutors." *See Ford*, 477 U.S. at 410–18, 106 S.Ct. at 2602–06. Justice Marshall encouraged states to be guided by the following general principles when developing procedures:

> [T]he lodestar of any effort to devise a procedure must be the overriding dual imperative of providing redress for those with substantial claims and of encouraging accuracy in the factfinding determination. The stakes are high, and the "evidence" will always be imprecise. It is all the more important that the adversary presentation of relevant information be as unrestricted as possible. Also essential is that the manner of selecting and using the experts responsible for producing that "evidence" be conducive to the formation of neutral, sound, and professional judgments as to the prisoner's ability to comprehend the nature of the penalty. Fidelity to these principles is the solemn obligation of a civilized society.

*Ford*, 477 U.S. at 417, 106 S.Ct. at 2605.

Justice Powell, who wrote separately in *Ford*, cast the fifth and decisive vote in favor of the judgment remanding the competency claim for further consideration. His opinion reflects the narrowest grounds for the Court's judgment and is thus controlling on the state courts and lower federal courts. *See Marks v. United States*, 430 U.S. 188, 193, 97 S.Ct. 990, 993, 51 L.Ed.2d 260 (1977), citing *Gregg v. Georgia*, 428 U.S. 153, 169 n. 15, 96 S.Ct. 2909, 2923 n. 15, 49 L.Ed.2d 859 (1976) (opinion of Stewart, Powell, and Stevens, JJ.). Justice Powell noted that the Court had left two important questions unresolved. With regard to the standard for determining competency Justice Powell stated, "I would hold that the Eighth Amendment forbids the execution only of those who are unaware of the punishment they are about to suffer and why they are to suffer it." *Ford*, 477 U.S. at 422, 106 S.Ct. at 2608. With regard to the procedures that states should adopt, Justice Powell concluded that less formal proceedings comporting with basic fairness and providing the basic requirements of due process were sufficient. *Ford*, 477 U.S. at 425–26, 106 S.Ct. at 2610. In so holding, Justice Powell noted that the issue of competency to be executed does not arise until after the prisoner has been validly convicted of a capital crime and sentenced to death. At this point, Justice Powell emphasized that the State has "a substantial and legitimate interest" in executing the prisoner as punishment for his crime, and this substantial and legitimate interest is not called into question by the prisoner's claim, because the only question raised by a competency claim is when the execution may occur, not whether it may occur. *Ford*, 477 U.S. at 425, 106 S.Ct. at 2610. Moreover, Justice Powell pointed out that by the time the competency to be executed issue is raised, the prisoner has already been judged competent to stand trial or his competency has not been seriously questioned. Finally, Justice Powell noted that competency to be executed is not an issue of historical fact, but calls for a basically subjective judgment which depends substantially upon expert analysis. 477 U.S. at 426, 106 S.Ct. at 2610. Given these considerations, Justice Powell opined that "ordinary adversarial procedures-complete with live testimony, cross-examination, and oral argument by counsel-are not necessarily the best means of arriving at sound, consistent judgments" on the issue of competency to be executed. *Id.* Although Justice Powell

did not provide specific parameters as to the procedures required, he summarized his view as follows:

> We need not determine the precise limits that due process imposes in this area. In general, however, my view is that a constitutionally acceptable procedure may be far less formal than a trial. The State should provide an impartial officer or board that can receive evidence and argument from the prisoner's counsel, including expert psychiatric evidence that may differ from the State's own psychiatric examination. Beyond these basic requirements, *the States should have substantial leeway to determine what process best balances the various interests at stake. As long as basic fairness is observed, I would find due process satisfied....*

*Ford,* 477 U.S. at 427, 106 S.Ct. at 2610 (emphasis added).

Justice O'Connor, joined by Justice White, dissented from the Court's finding in *Ford* that the Eighth Amendment forbids execution of the incompetent,[7] but found that the Florida statutes had created a state liberty interest in avoiding execution while insane which triggered the protections of the Due Process Clause. However, Justice O'Connor, concluded that the due process demands in this context are minimal, and stated that "there are any number of reasons for concluding that this 'particular situation' warrants substantial caution before reading the Due Process Clause to mandate anything like the full panoply of trial-type procedures." *Ford,* 477 U.S. at 429, 106 S.Ct. at 2611–12. While recognizing that the prisoner's interest in avoiding an erroneous determination is great, Justice O'Connor emphasized that "once society has validly convicted an individual of a crime and therefore established its right to punish, the demands of due process are reduced accordingly." 477 U.S. at 429, 106 S.Ct. at 2612. Although being convinced that "the Due

Process Clause imposes few requirements on the States in this context," Justice O'Connor found that the Florida procedure was inadequate because it totally denied the prisoner of any opportunity to be heard. *Id.* While stating that due process does not "invariably require oral advocacy or even cross-examination," Justice O'Connor concluded that "due process at the very least requires that the decisionmaker consider the prisoner's written submissions." 477 U.S. at 430, 106 S.Ct. at 2612.

Dissenting from both the conclusion that the Eighth Amendment prohibits execution of the insane and from the conclusion that states must adopt procedures to allow this right to be redressed, Justice Rehnquist and Justice Burger wrote in *Ford* that "wholly executive procedures can satisfy due process in the context of a post-trial, post-appeal, post-collateral-attack challenge to the State's effort to carry out a lawfully imposed sentence." *Ford,* 477 U.S. at 434–35, 106 S.Ct. at 2614. According to the dissenters, "[c]reating a constitutional right to a judicial determination of sanity before the sentence may be carried out, whether through the Eighth Amendment or the Due Process Clause, needlessly complicates and postpones still further any finality in this area of the law." *Ford,* 477 U.S. at 435, 106 S.Ct. at 2615.

Since the Supreme Court decided *Ford,* it has not provided further significant guidance as to either the standard of incompetency that applies or the procedures required, including the "threshold" showing needed to trigger a constitutionally required hearing process. *See, e.g., Rector v. Bryant,* 501 U.S. 1239, 1241–42, 111 S.Ct. 2872, 2875, 115 L.Ed.2d 1038 (1991) (Marshall, J., dissenting from denial of certiorari and disagreeing with the standard of insanity adopted by Justice Powell which was cited as controlling in *Penry v. Lynaugh,* 492 U.S. 302, 333, 109 S.Ct. 2934, 2954, 106 L.Ed.2d 256 (1989)). While the exact procedures required by

---

7. Since Justice O'Connor did not find an Eighth Amendment right, her opinion did not address or define the standard for competency.

*Ford* have not been delineated, all the various opinions in *Ford* indicate that a prisoner alleging incompetency to be executed is not entitled to the full panoply of trial rights to which a criminal defendant who has never been convicted of a crime is entitled.

Against this background, recently in *Van Tran*, 6 S.W.3d 257, this Court addressed both the standard for determining competency to be executed and the procedures which must be afforded to Tennessee prisoners asserting *Ford* claims. With respect to the standard, this Court adopted Justice Powell's definition and held that "a prisoner is not competent to be executed if the prisoner lacks the mental capacity to understand the fact of the impending execution and the reason for it." 6 S.W.3d at 266. Although the specific procedural protections adopted in *Van Tran* will be discussed in greater detail hereafter, we opined that the prisoner will not be entitled to a hearing unless the prisoner makes a threshold showing that there is a genuine disputed issue regarding the prisoner's present competency. 6 S.W.3d at 268. If the prisoner meets this threshold showing, then a hearing will be held and the prisoner should be afforded due process, including notice that an evidentiary hearing will be held, an opportunity to be heard and to present evidence relevant to the issue of competency at an adversarial proceeding, the right to cross-examine the State's witnesses, and the right to be present. 6 S.W.3d at 271. Under *Van Tran*, the prisoner is presumed competent, and to prevail on his or her claim, the prisoner must prove incompetency by a preponderance of the evidence. *Id.* We pointed out that the rules of evidence should not be applied to limit the admissibility of reliable evidence that is relevant to the issue of competency. *Id.* In addition, *Van Tran* directed the prisoner and the State to freely disclose to each other all information relating to the prisoner's competency. 6 S.W.3d at 269 n. 14.

Therefore, in analyzing the specific issues raised by the appellant in this case, we are mindful of the basic due process rights to which the prisoner is entitled under both *Ford* and *Van Tran*. However, we emphasize that a proceeding to determine competency to be executed is not a part of the criminal prosecution and thus the full panoply of rights due a defendant at trial are not due a prisoner in a competency proceeding. *Cf. Morrissey v. Brewer*, 408 U.S. 471, 480, 92 S.Ct. 2593, 2600, 33 L.Ed.2d 484 (1972) (stating that the full panoply of trial rights do not apply to a parole revocation procedure because it is not a part of the criminal prosecution). Although the appellant alleges various constitutional violations with respect to every single claim he asserts, the appellant provides no authority to support his assertions. We emphasize that the only relevant constitutional concern at a competency-to-be-executed hearing is the right to have the substantive Eighth Amendment claim determined in a manner that comports with procedural due process. With this introduction, we will address the specific issues raised by the State and the appellant.

### III.

### *PRE–HEARING PROCEDURE*

### Required Threshold Showing

Initially, the State contends that the appellant did not meet the threshold showing required to entitle him to a competency hearing under *Van Tran*, 6 S.W.3d at 268–69. The State contends that Dr. Kenner's affidavit was conclusory and did not provide factual details about the appellant's alleged delusional beliefs and how these beliefs rendered the appellant incompetent. The State suggests this Court can affirm the trial court's denial of relief on the grounds that the appellant did not meet the required threshold showing without either reviewing the evidence offered at the competency hearing or considering

the appellant's procedural challenges. We disagree.

In *Van Tran*, we stated that a prisoner raising the issue of competency to be executed must make an initial threshold showing that he or she is presently incompetent. 6 S.W.3d at 269. We emphasized that this showing may be met by submitting "affidavits, depositions, medical reports, or other credible evidence" which are sufficient to demonstrate that a genuine question exists regarding the prisoner's present competency. *Id.* As we observed, evidence which is stale is not relevant to the issue of present mental competency and will not be sufficient to meet the threshold. Only evidence which results from recent mental evaluations or observations of the prisoner should be submitted. 6 S.W.3d at 269. We noted that conclusory assertions are not sufficient, and in most circumstances, the affidavits, depositions, or medical reports attached to the prisoner's petition should be from psychiatrists, psychologists, or other mental health professionals. *Id.* A prisoner meets the threshold only "[i]f the trial court is satisfied there exists a genuine disputed issue regarding the prisoner's present competency...." *Id.* Once the prisoner establishes that a genuine disputed issue exists regarding his or her present competency, experts are appointed, mental evaluations are conducted, and a hearing is held. *Id.* By the time a competency hearing has been held and the case is pending before this Court on direct appeal, a wealth of information has been elicited about the prisoner's competency and a great deal of judicial resources have been expended.

Although *Van Tran* did not address the proper time for raising a challenge to the trial court's initial finding that the threshold is met, in light of the foregoing considerations, we conclude that once the hearing on competency has been conducted, any issue as to the correctness of the trial court's initial finding that the prisoner satisfied the threshold showing will be considered moot. To preserve this issue, the State must pursue an interlocutory appeal under Tennessee Rule of Appellate Procedure 9 or 10. In this case, the State did not pursue an interlocutory appeal. The issue is therefore moot, and we decline to address the State's claim that the trial court erred in finding that the threshold showing was satisfied.

## Right To Counsel During Examination By State Experts

The appellant contends that under the Sixth Amendment he was entitled to have his counsel present when he was examined by the State's experts. He also argues that the State violated his right to due process by misrepresenting that the examinations would be videotaped and that he has been denied the right to confront the State's witnesses. These claims are without merit.

In *State v. Martin*, 950 S.W.2d 20, 25–27 (Tenn.1997), we held that a criminal defendant has no right under either the Sixth Amendment to the United States Constitution or Article I, § 9 of the Tennessee Constitution to have counsel present during a court-ordered psychiatric examination. Since a criminal defendant has no right to have counsel present at a psychiatric examination prior to his or her criminal trial, we have no hesitation in holding that a prisoner asserting incompetence to be executed has no such right. As previously stated, the constitutional protections which are afforded during an initial trial do not apply in a proceeding to determine competency to be executed. As we recognized in *Van Tran*, "a proceeding to determine competency [to be executed] may be initiated only after all other available federal and state remedies have been exhausted." 6 S.W.3d at 269 n. 14. Accordingly, we reject the appellant's claim that the trial court erred by refusing to allow his counsel to be present during the State's mental examination.

■ We also reject the appellant's claim that his due process rights were violated by the State's failure to videotape the examination. In *Martin*, we noted that, although not constitutionally required, to assist both sides in preparing for trial, trial courts have the discretion to require that a court-ordered mental examination be taped upon a showing that such a safeguard is feasible and not unduly intrusive in a given case. 950 S.W.2d at 27. The trial court in this case did not abuse its discretion nor deny the appellant due process by refusing to order taping. The integrity, reliability, and accuracy of the truth-seeking function of the competency proceeding in this case was enhanced by full disclosure of the examining experts' reports and opinions. The record discloses that the decision not to videotape the evaluations was one made by the State's experts. There was no intentional misrepresentation made by the State. The Confrontation Clause claim has no substance because counsel was not prevented in any way from cross-examining the doctors who performed the evaluations.[8] The appellant was afforded his due process rights, and this issue is without merit.

### Issues Relating to the Appointment and Use of Mental Health Experts

■ The appellant raises several issues involving the trial court's appointment and use of mental health professionals. First, the appellant asserts that the trial court's refusal to appoint various experts in addition to the two mental health experts to

which he is entitled under *Van Tran* denied him equal protection and due process as guaranteed by *Ake v. Oklahoma*, 470 U.S. 68, 105 S.Ct. 1087, 84 L.Ed.2d 53 (1985), and the Sixth, Eighth and Fourteenth Amendments to the United States Constitution.

The record reflects that on December 20, 1999, voicing concern that his attorneys were unfamiliar with the competency issues in his case, the appellant filed an "Ex parte Motion for Funds for Expert Assistance" requesting funding for several experts to help investigate the appellant's condition prior to filing a petition to determine competency. In response, the trial court appointed and designated state funding for Dr. Kenner; Dr. Merikangas; Dr. Meltzer, a psychiatric expert on schizophrenia; Julie Hackenmiller, a forensic mental health investigator; and Dr. Pamela Auble, a neuropsychologist. The trial court, however, denied funding for a phsychopharmacologist/sexual abuse expert; a radiologist/PET scan/MRI scan; a psychiatric expert on psychiatric sequelae of trauma abuse; an endocrinologist; and experts on serotonin.[9]

■ We note initially that the only authorization to appoint state-funded mental health professionals prior to or during proceedings to determine whether a prisoner is competent to be executed derives from this Court's opinion in *Van Tran*. 6 S.W.3d at 269. Since the appellant's competency proceeding was not a criminal prosecution, the mandates of *Ake* and the Sixth Amendment to the federal constitu-

8. Since a competency hearing is not a "criminal prosecution," the Confrontation Clause of the Sixth Amendment is not applicable.

9. Although the trial court apparently felt that the appellant was entitled to have state-funded experts appointed to assist him prior to the filing of his petition (a right not afforded persons contemplating a post-conviction proceeding), in its order granting the petitioner a competency hearing the trial court denied the appellant's request to appoint mental health

experts in addition to Dr. Kenner and Dr. Merikangas noting that *Van Tran* limited the prisoner and the State to two experts each. *Cf. Fearance v. Scott*, 56 F.3d 633, 639–40 (5th Cir.1995) (rejecting the prisoner's claim that the state court's refusal to appoint a forensic expert denied the prisoner a full and fair hearing); *Lockett v. State*, 614 So.2d 888, 897 (Miss.1992) (commenting that the State is not required to fund the prisoner's fishing expedition).

tion do not apply.[10] Tennessee Code Annotated § 40–14–207(b) allows the appointment of investigative or expert services in capital cases; however, this Court has limited the application of this statute to the original capital trial and post-conviction proceedings arising therefrom. *Owens v. State,* 908 S.W.2d 923 (Tenn.1995). In addition, nothing in *Ford* requires that the State provide expert assistance to a prisoner contending that he is incompetent to be executed. As a result, the appellant was entitled only to the appointment of two mental health professionals in accordance with *Van Tran.* Therefore, the trial court's refusal to appoint additional mental health experts was not error.[11]

The appellant also objects to the trial court's ordering the disclosure of the reports of those experts whom the trial court appointed to consult with the appellant but whom the appellant did not intend to call as witnesses: specifically, Dr. Auble, Dr. Meltzer, and Dr. Walker. As stated above, the trial court had authorized the employment of these three doctors in addition to Dr. Kenner and Dr. Merikangas to assist the appellant's attorneys prior to their filing the petition to determine competency. When the State issued subpoenas for the records of these experts, the appellant moved to quash the subpoenas. Although the trial court granted the motion to quash, it found that the entire files created by these three doctors during their examinations of the appellant were relevant to the determination of the appellant's competency and ordered that the files be submitted under seal to the court for use by the mental health experts appointed by the court and by the court itself.[12]

The appellant contends that the reports of these three experts should not have been disclosed because disclosure (1) violated the principles of pretrial disclosure, the work product rule and the consulting expert doctrine set out in Tenn. R. Civ. Proc. 26 and Tenn. R.Crim. Proc. 16; (2) violated the Fourth, Fifth, Sixth and Fourteenth Amendments to the United States Constitution; and (3) violated the due process mandated by *Ford.*

Initially we note that the discovery rules, work product, and consulting expert doctrine are procedural rules designed for criminal and civil trials. A competency proceeding is sui generis; it is not a trial, and the only procedures applicable

---

**10.** This statement also means that the appellant had no right to seek funding by way of an ex parte motion or hearing. As this Court explained in *State v. Barnett,* 909 S.W.2d 423 (Tenn.1995), as a general proposition, ex parte hearings are disfavored. *Id.* at 428. An ex parte hearing was granted in *Ake* and in *Barnett* only because such a hearing was constitutionally required to preserve the theory and strategy the indigent defendants intended to pursue at trial. *Id.* The considerations which justified ex parte proceedings in *Ake* and *Barnett* are not present in a competency to be executed proceeding. In a competency to be executed proceeding, there is no theory or strategy to preserve; the hearing relates wholly to a single issue and the reports of the mental health experts must be disclosed under *Van Tran.* No language in either *Ford* or *Van Tran* indicates that ex parte proceedings are required or appropriate. Therefore, the appellant was afforded a right to which he was not entitled when the trial court allowed him to proceed ex parte in his attempts to secure funding for additional expert assistance.

**11.** In fact, the court went beyond the dictates of *Van Tran* by appointing and funding mental health experts in addition to Drs. Kenner and Merikangas. However, this error does not require remand. First of all, the appointment of additional experts granted the appellant more than he was entitled to under *Ford* or *Van Tran.* Second, the State apparently consented to this violation of the *Van Tran* procedures and did not file an interlocutory appeal in this Court challenging this departure from *Van Tran.*

**12.** The appellant filed an extraordinary appeal under Tenn. R.App. P. 10 in this Court challenging the trial court's order requiring disclosure. This Court denied the application because it did not meet the requirements of Rule 10. However, denial of a Rule 10 application does not constitute a ruling on the merits of the underlying issue. Accordingly, we are addressing the merits of this issue for the first time in this appeal.

are those set out in *Van Tran*. The rules of civil and criminal procedure do not apply to competency proceedings except to the extent that *Van Tran* is silent on a procedure and the Rules offer an appropriate procedure that does not conflict with the purpose of the competency hearing. *See State v. Reid,* 981 S.W.2d 166, 170 (Tenn.1998)(trial court has inherent power to adopt appropriate rules of procedure patterned upon analogous rules of procedure).

 In addition, as previously noted, except for the requirements of due process mandated by *Ford,* none of the amendments to the Federal Constitution relied on by the appellant are pertinent to the procedures adopted by this Court for determining competency to be executed. A prisoner at a competency hearing has no Sixth Amendment right to the effective assistance of counsel inasmuch as these proceedings are not "a criminal prosecution." *Cf. Murray v. Giarratano,* 492 U.S. 1, 10, 109 S.Ct. 2765, 2770, 106 L.Ed.2d 1 (1989); *House v. State,* 911 S.W.2d 705, 712 (Tenn.1995)(no constitutional right to counsel or effective assistance of counsel at post-conviction proceedings.) In addition, the guaranty of the Fourth Amendment against unreasonable searches and seizures is not applicable to these circumstances. Likewise the Fifth Amendment does not apply, except to the extent that *Ford* requires these proceedings comport with procedural due process, notice, and an opportunity to be heard. *See* 477 U.S. at 425, 106 S.Ct. at 2609 (Powell, J., concurring). The only constitutional question presented is whether the trial court's order comports with basic due process which essentially means basic fairness. *See id.* Since the only issue in a competency proceeding is the prisoner's mental state, full reciprocal disclosure of experts appointed to assist either party does not offend basic notions of fairness and due process. *Cf.* Ariz.Rev.Stat. Ann. § 13.4022(C) (West 1998 Supp.)(providing that in a competency to be executed hearing "[t]he parties

shall also disclose to the appointed experts and to each other the names and addresses of any other previously undisclosed mental health experts who have examined the prisoner and the results of the examinations"); Tex.Crim. P.Code Ann. § 46.04(j) (West 1999) (providing that a prisoner who files a competency petition "waives any claim of privilege with respect to, and consents to the release of, all mental health and medical records relevant to whether the [prisoner] is incompetent to be executed").

In *Van Tran,* this Court expressly adopted a policy of free and open disclosure of all information relating to the prisoner's competency. *See* 6 S.W.3d at 269 n. 14. The established and clear goal of competency proceedings is to accurately ascertain the prisoner's mental state. Mental health experts appointed by the trial court in competency proceedings are not experts "retained" by the parties but are experts appointed to assist the trial court in reaching an impartial and fully informed decision regarding competency. *Cf.* Tenn. R. Evid. 706 (providing for experts to be appointed by the court in a bench trial and their availability to all parties). Likewise, once an expert is appointed by the Court to assist a party in the determination of the prisoner's mental state, he or she is subject to the requirement of full disclosure in *Van Tran. See* 6 S.W.3d at 269 (requiring mental health professionals to file written evaluations with the court and copies of the evaluations to be given to the parties). Even in the context of a civil or criminal trial, disclosure is required in similar situations, where the mental condition of a party is in controversy. *See State v. Huskey,* 964 S.W.2d 892, 899 (Tenn.1998); Tenn. R. Civ. P. 35. Therefore, the trial court's order requiring disclosure of the reports of the experts previously appointed by the court was consistent with the principles of due process as described in *Ford* and *Van Tran.*

 The appellant also complains that the trial judge's consideration of the

reports of those experts who did not testify, specifically Dr. Meltzer, violated the hearsay rule, the Sixth Amendment to the United States Constitution and due process. This claim has no merit.[13] The court's consideration of these reports was not restricted by the hearsay rule. *Van Tran* provides that the rules of evidence are not applicable to limit the admissibility of reliable evidence that is relevant to the issue of the prisoner's competency. 6 S.W.3d at 271. As noted earlier, since this case is not a "criminal prosecution," the confrontation clause of the Sixth Amendment is not applicable.

■■■■ Finally, consideration of the reports does not violate the due process requirements of *Ford* or *Van Tran.* The plurality opinion in *Ford* contemplates that the prisoner should be able to challenge or clarify the State's proof either by means of cross-examination or "a less formal equivalent." 477 U.S. at 415, 106 S.Ct. at 2604 (Marshall, J, plurality opinion). Justice Powell opined that live testimony and cross-examination are not essential to "arriving at sound, consistent judgments as to a [prisoner's] sanity." 477 U.S. at 426, 106 S.Ct. at 2610. No language in *Ford* indicates that due process precludes the State from introducing or the trial court from considering documentary proof. So long as the prisoner is afforded an opportunity to review the proof and to challenge or clarify its contents, either by live witnesses or other documentary proof, the due process required by *Ford* is satisfied. Although we stated in *Van Tran* that the "prisoner is entitled to cross-examine the State's witnesses," we did not by that statement intend to preclude the State from relying upon reports of experts who are not called as witnesses. We meant only that if the State calls a witness, the prisoner must be allowed to cross-examine the witness. With respect to documentary proof we hold that due process requires only that the prisoner be afforded an opportunity to review, challenge, or clarify the proof.

In this case, the appellant was allowed to cross-examine all of the witnesses offered by the State. Moreover, the appellant was fully aware of the contents of Dr. Meltzer's report. In addition, the appellant had ample time to review the report and was not precluded from challenging or clarifying the information and opinions contained in the report. In fact, one of the appellant's experts, Dr. Merikangas, testified with respect to Dr. Meltzer's report and disagreed with the conclusions reached by Dr. Meltzer. We therefore find no merit in the appellant's contention that the trial court's consideration of Dr. Meltzer's report violated his right to due process.

### Disqualification of the Attorney General's Office

■■■ The appellant contends that the trial court erred by denying his motion to disqualify the entire Office of the State Attorney General and Reporter because Attorney General Paul Summers previously acted in a judicial capacity in the appellant's case when, while serving as a judge of the Court of Criminal Appeals, he authored an opinion affirming the dismissal of the appellant's second post-conviction petition and setting an execution date. *See Robert Glen Coe v. State*, CCA No. 138, 1991 WL 2873 (Tenn.Crim.App., Jackson, Jan. 16, 1991).

In an order filed December 9, 1999, this Court granted the appellant's motion to disqualify Attorney General Summers from this case. However, this Court denied the appellant's motion to disqualify the entire Office of the Attorney General because General Summers' prior judicial involvement imparted no confidential information to the staff of the Office of the Attorney General. *See State v. Tate*, 925

---

**13.** The appellant contends that these reports were not part of the record of the competency proceeding. This contention is without merit.

The reports are contained in a sealed exhibit which was filed with the record on appeal.

S.W.2d 548, 556 (Tenn.Crim.App.1995); *Mattress v. State*, 564 S.W.2d 678, 680 (Tenn.Crim.App.1977) (holding that disqualification of a governmental office is required only when an actual conflict of interest is present or confidential communications are disclosed). This disqualification issue clearly was resolved by this Court's order of December 9, 1999, denying the appellant's motion to disqualify the entire Office of the Attorney General. Accordingly, the appellant's assertion that the trial court erred by denying the same motion is entirely without merit.

### Prosecutorial Misconduct

The appellant contends that "prosecutorial misconduct" occurred when an assistant district attorney general informed the trial court during a pre-hearing discussion that correctional officers had told him that the appellant had not been acting in a bizarre manner. The appellant contends that the "prosecutorial misconduct" deprived him of due process under *Ford* because the statements caused the trial court to be biased against him. We have examined the prosecutor's statements and conclude that the statements did not constitute prosecutorial misconduct or deprive the appellant of due process.

The comments about which the appellant now complains were made in response to the appellant's request for discovery of any statements that the appellant had made to correctional officers. One of the appellant's attorneys stated that he would be attempting to contact correctional officers "over the weekend" to determine if any of them had witnessed any bizarre behavior. The assistant district attorney general responded that, although the State had spoken to several correctional officers, it had no statements from them indicating that the appellant was delusional. The assistant district attorney general added:

> I can assure Mr. Hutton that there is nothing exculpatory that we found. And we obviously wanted to see if someone said that he was in fact acting bizarre. And out of the fifteen or twenty guards that I talked to, no one indicated that he acted psychotic or bizarre. In fact, the consensus was that this is all just a big game he's playing. So, you know, obviously, if there is something that was even approachable to a symptom that I could give Mr. Hutton—we did not discover any. And I can at least assure him of that. There's not something there that they're missing, as far as what these guards are saying.
>
> But, I think, obviously, its important for them to talk to them themselves, and not just take my word for it. But I'm not in the possession of anything exculpatory. There's been no deals made with anybody. There's been—It's just strictly interview, and personnel.

Clearly, the assistant district attorney general's remarks were intended to assist the appellant's counsel and the trial court by communicating information directly pertinent to the issue which had been raised by the appellant's counsel-the existence of correctional officer statements relating that the appellant was behaving in a bizarre or unusual manner. These statements did not constitute prosecutorial misconduct.

Had counsel's remarks been improper, his comments, which were supported by the guards who did testify and by the opinions of the State's expert witnesses did not prejudice the appellant much less render the hearing fundamentally unfair. In addition, the record contains no indication that these statements deprived the appellant of due process by causing the trial court to be biased against him. This issue is without merit.

### Denial of Continuance

On the day the competency hearing began, the appellant filed a motion for a continuance claiming that he needed additional time to find an expert witness to counter the State's theory that the appellant was malingering. The appellant also claimed that a continuance was necessary

to find a handwriting expert to respond to the State's expert. A few days before, the court had granted a Certificate of Need to subpoena an expert witness on the issue of malingering and had granted funds to the appellant to employ a handwriting expert. The appellant argues, however, that in light of the date set for the hearing, it was unrealistic and impossible for him to obtain these witnesses. Thus, he says, his competency hearing was fundamentally unfair under *Ford* and the Fourth, Fifth, Sixth, Eighth and Fourteenth Amendments to the United States Constitution.

A trial court's denial of a request for a continuance will only be reversed upon a showing of abuse of discretion. *State v. Cazes*, 875 S.W.2d 253, 261 (Tenn.1994). In this case, the appellant has failed to show that the trial court abused its discretion. Counsel for the appellant had received the reports of the State's experts on January 13, 2000, eleven days before the hearing was scheduled to begin and were aware that the State's experts were reporting the appellant to be malingering. In addition, counsel for the appellant was aware that the State intended to call a handwriting expert as is evidenced by his request for funding for a handwriting expert. Despite this knowledge, counsel waited until the day the hearing was scheduled to begin to make a motion for a continuance. The trial court did not abuse its discretion in denying the motion.

In any event, the appellant has failed to demonstrate that he was denied due process by the trial court's ruling. The appellant was able to meet and contradict the State's proof about malingering through the testimony of Dr. Merikangas, Dr. Kenner, and Dr. Walker. All three of these witnesses disagreed with the State's witnesses and testified that the appellant was not malingering. Moreover, as the trial court recognized, the question of malingering was, by and large, irrelevant to the question of whether the appellant was competent to be executed. Furthermore, the appellant's inability to find a handwriting expert clearly did not constitute a denial of due process. The trial court expressly stated that in determining the appellant's competency it did not consider the evidence upon which the State offered the testimony of the handwriting expert. Accordingly, the trial court's denial of the appellant's motion for a continuance did not deprive the appellant of due process.

## IV.

### *HEARING PROCEDURES*

### Right to Jury Determination

Initially, the appellant contends that his right to due process was violated because the issue of competency was not tried to a jury. Specifically, he contends that having the trial judge preside over the many procedural aspects of the case adversely affected the impartiality of the judge as the trier of fact and thereby denied him his right to due process. We disagree. As was stated in *Van Tran*, none of the various opinions in *Ford* indicate that a prisoner has a due process right to a jury trial on the issue of competency to be executed. *See Ford*, 477 U.S. at 418, 106 S.Ct. at 2606 (plurality opinion) ("[p]etitioner is entitled to an evidentiary hearing in the District Court, *de novo*, on the question of his competence to be executed."); *Ford*, 477 U.S. at 427, 106 S.Ct. at 2610 (Powell, J., concurring) ("[A] constitutionally acceptable procedure may be far less formal than a trial. The State should provide an impartial officer or board that can receive evidence and argument from the prisoner's counsel...."); *Ford*, 477 U.S. at 429, 106 S.Ct. at 2611–12 (O'Connor, J., concurring in the result in part and dissenting in part) ("I consider it self-evident that once society has validly convicted an individual of a crime and therefore established its right to punish, the demands of due process are reduced accordingly."). In addition, only three

states afford such a right by statute. *See* 6 S.W.3d at 270 (citing statutes). Accordingly, we reaffirm our holding in *Van Tran* that a prisoner has no right to a jury trial in a competency proceeding.[14] The appellant's claim that denying a jury trial adversely affected the impartiality of the trier of fact is without merit.

### Burden of Proof

■ The appellant next claims that his right to due process was violated because *Van Tran* assigned to the prisoner the burden of proving incompetence by a preponderance of the evidence. Again, we reject this claim. Our holding on this issue in *Van Tran* is consistent with Justice Powell's opinion in *Ford, see* 477 U.S. at 426, 106 S.Ct. at 2610, as well as the law of several other states relating to competency to be executed procedures. *See* 6 S.W.3d at 271 (citing statutes and cases). Requiring the appellant to bear the burden of proof on the issue did not deprive him of due process.

### Standard of Competency

■ The appellant next argues that the standard of competency adopted by this Court in *Van Tran,* and applied by the trial judge in this proceeding, violates his rights under the Eighth and Fourteenth Amendments to the United States Constitution and Article I, Sections 8 and 16 of the Tennessee Constitution. Specifically the appellant argues that the standard for determining competency must be tailored to reflect the reason which supports the constitutional prohibition on execution of the incompetent. According to the appellant, if the standard does not serve the reason for the substantive right, the standard is unconstitutional. In addition, the appellant argues that the standard is unconstitutional because it does not include the common law assistance prong which

required that a prisoner be held incompetent if the prisoner lacked sufficient capacity to assist his attorney.

We reject the appellant's constitutional challenges to the standard adopted in *Van Tran* and applied in this case. The standard adopted by this Court in *Van Tran,* 6 S.W.3d at 266, was enunciated by Justice Powell in his separate opinion in *Ford.* As previously stated, Justice Powell is the only member of the *Ford* Court to offer guidance as to the standard for determining competency in the Eighth Amendment context. Again, as previously stated, since Justice Powell cast the fifth and decisive vote, his opinion reflects the narrowest grounds for the Court's judgment and is controlling on the state courts and lower federal courts as to the minimum standard. *See Marks* 430 U.S. at 193, 97 S.Ct. at 993. Moreover, the standard adopted by Justice Powell has been adopted by a number of other states. *See Van Tran,* 6 S.W.3d at 266 (citing statutes). Finally, and perhaps most importantly, the standard adopted by Justice Powell has been cited as controlling in a subsequent decision of the United States Supreme Court. *See Penry v. Lynaugh,* 492 U.S. at 333, 109 S.Ct. at 2954. Accordingly, we reject the appellant's claim that the standard is unconstitutional and reaffirm our holding in *Van Tran* that under Tennessee law a prisoner is "not competent to be executed if the prisoner lacks the mental capacity to understand the fact of the impending execution and the reason for it." 6 S.W.3d at 266.

The appellant next contends that the trial court in this case misapplied the standard and required only that the appellant be "aware" of the fact of the impending execution and the reason for it while this Court's decision in *Van Tran* requires that the prisoner "understand" the fact of the impending execution and the reason for it. The appellant asserts that he had only

---

14. As in this case, Justice Birch dissented in *Van Tran* from our conclusions that a prisoner is not entitled to a jury trial, that the prisoner bears the burden of proving incom-

petency by a preponderance of the evidence, and that the criteria for deciding competence for execution should include an inquiry into the prisoner's ability to assist counsel.

"awareness" and not "understanding." According to the appellant, Dr. Merikangas's testimony, and particularly the following passages, support his assertion.

He [the appellant] also has the delusional belief that if he is executed, he will just simply be in another place in the same body, will visit his ex-wife and child. He will maybe temporarily be one of these balls of fire that speaks to people.

Mr. Coe does not understand the meaning of death nor does he feel that being executed will be a punishment. Rather he views his forthcoming execution as a release from his present situation in order that he may return to life.

His [the appellant's] view of it [death] is a little bit idiosyncratic in that he will suddenly be alive as Robert Coe outside of prison with his ex-wife and daughter. [The appellant] is aware, and I think your expert used the word aware not the word understand in his report, the bottom line of your expert's report is he is aware. I agree that he is aware of an execution. My point is he does not have the mental capacity to understand.

[The appellant] lacks the mental capacity to understand why he is being put to death. To him it is not punishment. To him it is a relief that he seeks from his suffering.... And his understanding of what will happen when he is given the needle, the intravenous drug that will kill him, is that he will then be out of prison and he will be walking around. And I don't know of any religion where that is part of the dogma.

In my opinion, Mr. Coe is aware of his impending execution and the reasons for it. The words used in the *Van Tran* decision is the mental capacity for understanding. Now to say that a delusional, hallucinating, psychotic, person who decompensates and dissociates under stress and whose delusional belief is that his death is to prevent the truth from coming out and that the consequence of the execution is that he will

return to earth in this body and go live with his separated wife and child, his now grown daughter, as a delusion, does not indicate that he has an understanding either of the consequences of being executed or the reason for it.

As is obvious from a cursory reading of *Van Tran* and *Ford,* the appellant's argument is without merit. The following quote from *Van Tran* is instructive.

We agree with Justice Powell that in a proceeding to determine competency to be executed only those who are unaware of the punishment they are about to suffer and the reason they are to suffer it are entitled to a reprieve. [citation omitted] Accordingly, we adopt the "cognitive test," and hold that under Tennessee law a prisoner is not competent to be executed if the prisoner lacks the mental capacity to understand the fact of the impending execution and the reason for it.

6 S.W.3d at 266. This quote demonstrates that this Court was not ascribing to "awareness" and "understanding" the technical meanings that these words may have in the field of psychology. The words should be given their ordinary, common meanings. Justice Powell also employed various terms in his concurring opinion in *Ford,* 477 U.S. at 422, 106 S.Ct. at 2608 ("know," "perceives," "aware," and "unaware."). Clearly, Justice Powell did not intend to assign a technical meaning to the words he used in describing the Eighth Amendment competency standard. He was using various terms as synonyms just as this Court did in *Van Tran.* Even Dr. Merikangas testified that "[the appellant's] understanding of why he's been convicted is that he was convicted for a crime he did not commit that was involving murdering and raping an eight year old girl." Under *Van Tran,* a prisoner need only understand or be aware of the fact of his or her impending execution and the reason for it. The appellant's claim that these two words are distinct and that the trial court in this

case misapplied the standard adopted in *Van Tran* is without merit.

 To the contrary, we agree with the State that the evidence in this record fully supports the trial court's finding that the appellant has the mental capacity to understand the fact of his impending execution and the reason for it.[15] Interestingly, a great deal of time, energy, and proof at this hearing was devoted to either describing the various diagnoses of mental disorders or to establishing and rebutting the claim of malingering. Without question, all of the mental health professionals eventually concluded that the appellant had some type of mental disorder, although there was disagreement as to the precise diagnosis and to the seriousness of the disorder. However, the problem for the appellant is that the existence of a mental disorder does not automatically translate into a finding of incompetency to be executed. *See Weeks v. Jones*, 52 F.3d 1559, 1569 (11th Cir.1995); *Shaw v. Armontrout*, 900 F.2d 123 (8th Cir.1990); *Lowenfield v. Butler*, 843 F.2d 183, 186 (5th Cir.1988); *Billiot v. State*, 655 So.2d 1, 17 (Miss.1995).

The evidence in this record fully supports the trial court's finding that the appellant is competent. Dr. Merikangas admitted that the appellant was aware of his impending execution and of the reason for the execution, but he attempted to draw a distinction between "understanding" and "awareness," a distinction which, as we have just concluded, does not exist. While

Dr. Kenner opined that the appellant will become incompetent as his execution approaches, Dr. Kenner admitted that the appellant had been competent during his last interview. Dr. Matthews, Dr. Martell, and Dr. Walker all testified that the appellant had the mental capacity to understand the fact of his impending execution and the reason for it, and Dr. Meltzer's report was consistent with their testimony.

Moreover, the appellant's conduct both before and during the hearing is further support for the trial court's finding of competency. The appellant has already chosen a method of execution. He has indicated that he would like to be allowed to donate his organs. He has indicated that, if offered, he will refuse to accept any sedatives prior to his execution because he "think[s] there might be a God, and I've got enough to deal with him, without being drunk on Valium." Comments made by the appellant during the competency hearing, and set out in the trial court's order which is attached hereto as an appendix, indicate that the appellant understands his current legal proceedings. While he maintains that he is innocent, the record clearly reflects that the appellant knows that he was sentenced to death for murdering a young girl. The appellant's comments asserting his innocence and contending that the purpose of his execution is to prevent the truth from coming out actually demonstrate that he understands the fact of his impending execution and the reason for it. *Cf. Schornhorst v. Anderson*, 77 F.Supp.2d 944, 955 (S.D.Ind.1999) (stating that the

15. In his reply brief, filed March 2, 2000, the appellant argues that the evidence at the hearing "overwhelmingly" establishes that he will be incompetent on March 23, 2000, the day of his scheduled execution. He specifically relies upon the testimony of Dr. Kenner and ·Dr. Merikangas in support of his assertion. The issue before the trial court was the appellant's *present* competency to be executed. The evidence in this record overwhelmingly supports the trial court's finding that the appellant is presently competent to be executed. As we stated in *Van Tran*, "[i]f a prisoner is found to be competent, subsequent *Ford* claims will be disallowed unless the prisoner, by way of a motion for stay, provides this

Court with an affidavit from a mental health professional showing that there has been a substantial change in the prisoner's mental health since the previous determination of competency was made and the showing is sufficient to raise a substantial question about the prisoner's competency to be executed." 6 S.W.3d at 272. Thus, any future change in the appellant's mental health must be raised as provided in *Van Tran*. We emphasize, however, that conclusory affidavits will not satisfy the showing that there has been a "substantial change" in the prisoner's mental health sufficient to "raise a substantial question about the prisoner's competency to be executed." *Id.*

prisoner considered his execution unfair, but finding that the prisoner had failed to make a threshold showing of incompetency).

 Finally, the appellant's unusual views about what will happen to him after he is executed are not pertinent to the question of his competency because they do not impede his ability to understand the fact of his impending execution and the reason for it. As courts have recognized, what occurs beyond death is not a subject on which any witness can be qualified as an expert, and every person is free to believe as he or she may wish on that subject. *See Weeks,* 52 F.3d at 1570 and *Weeks v. Jones,* 100 F.3d 124, 125 n. 3 (11th Cir.1996) (finding that the prisoner's belief that he would be transformed into a giant tortoise upon his death and rule the universe did not render him incompetent to be executed); *Garrett v. Collins,* 951 F.2d 57, 58 (5th Cir.1992) (finding the prisoner competent to be executed despite his belief that his deceased aunt would save him through supernatural intervention).

Accordingly, we conclude that the appellant's constitutional challenges to the standard for determining competency and his challenges to the trial court's application of the standard are without merit. We agree with the State that the evidence in this record fully supports and does not preponderate against the trial court's finding that the appellant is competent to be executed.

### Application of Tennessee Rule of Evidence 615

The appellant contends that the trial court erred in allowing the State's experts to remain in the courtroom during the testimony of the appellant's experts. The appellant argues that he invoked Tenn. R. Evid. 615 [16] and the trial court should have applied Rule 615 because the State failed to demonstrate an exception to its application. He argues that the trial court's failure to apply the rule to exclude the State's experts deprived him of due process because his experts are in the private practice of psychiatry and were unable to be in the courtroom throughout the presentation of the State's proof because of the demands of their private practices.

 The question presented by the appellant's claim is whether Tenn. R. Evid. 615 applies to hearings to determine competency to be executed. While *Van Tran* does not directly address this precise issue, this Court stated that the rules of evidence should not be applied to limit the admission of reliable evidence that is relevant to the issue of the prisoner's competency. 6 S.W.3d at 271. Allowing the mental health experts to remain in the courtroom during the presentation of the proof is entirely consistent with the purpose of competency proceedings which is to accurately ascertain the prisoner's mental state. There is no language in *Ford* which would require application of Tenn. R. Evid. 615. In fact, Justice Marshall in the plurality opinion wrote that "the adversary presentation of relevant information should be as unrestricted as possible." *Ford,* 477 U.S. at 417, 106 S.Ct. at 2605. Also, the dangers Rule 615 is intended to prevent do not arise in a proceeding to

**16.** Rule 615 provides as follows:

At the request of a party the court shall order witnesses, including rebuttal witnesses, excluded at trial or other adjudicatory hearing. In the court's discretion, the requested sequestration may be effective before voir dire, but in any event shall be effective before opening statements. The court shall order all persons not to disclose · by any means to excluded witnesses any live trial testimony or exhibits created in the courtroom by a witness. This rule does not authorize exclusion of (1) a party who is a natural person, or (2) a person designated by counsel for a party that is not a natural person, or (3) a person whose presence is shown by a party to be essential to the presentation of the party's cause. This rule does not forbid testimony of a witness called at the rebuttal stage of a hearing if, in the court's discretion, counsel is genuinely surprised and demonstrates a need for rebuttal testimony from an unsequestered witness.

determine competency to be executed. In light of the fact that both the State and the prisoner have access to the reports of the experts prior to the hearing, there is little or no risk that one of the expert witnesses will change his or her testimony or adopt facts testified to by earlier witnesses. *See State v. Harris*, 839 S.W.2d 54, 68 (Tenn. 1992) (discussing the purposes of the rule). Accordingly, we conclude that the trial court did not err, and we hold that Tenn. R. Evid. 615 should not be applied to exclude expert witnesses from hearings to determine competency to be executed.

We also hold that the trial court's refusal to apply the rule did not deprive the appellant of due process. The trial court's ruling applied to both parties. The appellant's experts were free to remain in the courtroom after they testified, and it appears from the record that one defense expert, Dr. Merikangas, was in the courtroom during part of the State's case because he testified as an offer of proof about the potential physical dangers to the appellant from the gag. The trial court can not be charged with error simply because the appellant's experts had professional practice commitments that precluded them from remaining in the courtroom, especially when the appellant never requested additional funding that would have enabled his experts to remain. The appellant's claim that he was denied due process is without merit.

### Bias of the Trial Court

The appellant contends that he was denied his due process right to an impartial trier of fact. He asserts that the trial court's order to gag him when his behavior became disruptive constituted an implicit finding that the appellant was acting intentionally and indicated that the trial court had already decided the essential issue. The appellant contends that the trial court's denial of his motion for recusal further illustrates that the court was biased against him.

Even during a trial, a criminal defendant can constitutionally be gagged or removed from the courtroom if the criminal defendant is engaging is disruptive conduct. *See Illinois v. Allen*, 397 U.S. 337, 90 S.Ct. 1057, 25 L.Ed.2d 353 (1970); *State v. Cole*, 629 S.W.2d 915 (Tenn.Crim.App.1981). While we stated in *Van Tran* "that the prisoner shall be present at the hearing," *see* 6 S.W.3d at 271, we did not mean to imply that the right of a prisoner to be present at a competency hearing is absolute and cannot be waived even if the prisoner behaves in a disruptive and assaultive fashion. Indeed, a future case may arise in which the prisoner can attend no part of the competency hearing because the prisoner's behavior poses a substantial risk of danger to himself or others at the hearing. While a prisoner should not be unreasonably precluded from attending or remaining in a competency hearing, we hold that trial courts have the authority to remove or exclude prisoners who are behaving in a disruptive manner or who are posing a risk of danger to either themselves or others in attendance at the hearing. No due process right of the prisoner is offended by such a holding.

In addition, no due process right of the appellant was violated by the trial court's actions in this case. The trial court was very careful to afford the appellant his right to be present at the competency proceeding. The appellant engaged in tremendously disruptive conduct for an extended period of time. The trial court was reluctant to utilize the gag, but eventually concluded that the restraint was necessary to enable the appellant to remain in the courtroom. After the gag was applied, the trial court directed medical personnel to regularly check the appellant's physical condition. Once the trial court learned that an option was available which would accommodate both the appellant's interest in being present and viewing the proceeding and the trial court's interest in maintaining order, the trial court readily

agreed to that option. Even after the appellant was moved to the viewing room, the trial court continued to scrupulously guard the appellant's rights. The trial court allowed one of the appellant's attorneys to remain in the room with the appellant, and, after each witness, the trial court afforded to the appellant's counsel in the courtroom an opportunity to confer with the appellant and co-counsel in the viewing room. The record clearly reflects that the trial court's decision to gag and eventually remove the appellant from the proceeding was the product of necessity, not the product of bias. At all times, the trial judge in this case conducted himself with patience, dignity, and decorum. The trial court did not err by denying the motion for recusal.

### Admissibility of Dr. Martell's Testimony

As previously stated, Dr. Martell, who is licensed to practice psychology in New York and California but not in Tennessee, performed a forensic evaluation of the appellant and testified at the competency hearing on behalf of the State. The appellant contends that the trial court should not have considered the testimony of Dr. Martell because he did not comply with the requirements of Tenn.Code Ann. § 63–11–211(b)(5) for obtaining a temporary license to practice psychology in Tennessee. The appellant further asserts that the trial court allowed Dr. Martell to violate the criminal law by performing the evaluation and by testifying, *see* Tenn.Code Ann. § 63–11–206(a) (providing that the unlicensed practice of psychology is a Class B misdemeanor), and that utilization of this "illegal" witness rendered the proceedings fundamentally unfair under *Ford*, the Fourth, Fifth, Sixth, Eighth, and Fourteenth Amendments to the United States Constitution. The State responds that § 63–11–211(b)(5) did not apply because Dr. Martell's evaluation of the appellant and his testimony as an expert witness did not involve performing the functions for which authorization is required under the statute.

Section 63–11–211(b)(5) provides:

The board [of examiners in psychology] may, upon prior written request, grant written authorization for a psychologist licensed in good standing in another state and who meets standards acceptable to the board to perform the functions of §§ 63–11–203 [practice of psychologist] and 63–11–208(d)(2)(B) [health service provider], without possessing a license to practice as a psychologist in Tennessee when under the supervision of a Tennessee licensed psychologist in good standing. Such authorization shall not exceed thirty (30) days per year. Such authorization shall be for such purposes as special training or consultation, special evaluation and/or intervention, and serving as an expert witness. Nothing in this section shall be construed to permit regular, repetitive or ongoing provision of psychological services, or supervision of psychological services, or for the solicitation or advertisement of services to the general public.

This reciprocity statute allows a psychologist who is licensed in another state, but not in Tennessee, to receive written authorization to temporarily perform the functions of a psychologist or a health service provider when under the supervision of a Tennessee licensed psychologist. The statute gives examples of the purposes for such authorization: special training or consultation, special evaluation and/or intervention, and serving as an expert witness.

Since the appellant does not contend that Dr. Martell performed the functions of a health service provider, the first question is whether Dr. Martell was practicing as a psychologist when he conducted a forensic evaluation of the appellant in conjunction with the competency proceedings. "Practice of psychologist" is defined in Tenn.Code Ann. § 63–11–203(a) as

the observation, description, evaluation, interpretation, and modification of human behavior by the application of psy-

chological principles, methods, and procedures, *for the purpose of preventing or eliminating* symptomatic, maladaptive, or undesired behavior *and of enhancing* interpersonal relationships, work and life adjustment, personal effectiveness, behavioral health, and mental health. (Emphasis added.)

The only purpose of Dr. Martell's evaluation was to determine whether the appellant is competent to be executed. The evaluation was not for the purpose of "preventing or eliminating" any psychological illness of the appellant and "enhancing" his mental health. Therefore, the performance of the forensic evaluation did not constitute the practice of psychology and no authorization was required under § 63–11–211(b)(5).

■■■ The next question is whether Dr. Martell was required to receive written authorization under § 63–11–211(b)(5) to testify as an expert witness. We must determine what is meant by the language in the statute including "serving as an expert witness" as one of the purposes for such authorization. The Court's role in statutory interpretation is to determine and give effect to the legislative intent without unduly restricting or expanding a statute's coverage beyond its intended scope. *State v. Butler*, 980 S.W.2d 359, 362 (Tenn.1998). The component parts of a statute should be construed, if possible, so that the parts are consistent and reasonable. *State v. Alford*, 970 S.W.2d 944, 946 (Tenn.1998).

■■■ The appellant's interpretation, which would require written authorization for any out-of-state psychologist serving as an expert witness, would render that part of the statute inconsistent with the provision limiting the requirement of written authorization and would expand the statute's coverage beyond its intended scope. As discussed above, the written authorization referred to in § 63–11–211(b)(5) must be obtained only by an out-of-state psychologist who will perform the functions of a psychologist or a health service provider.

The inclusion of "serving as an expert witness" as one of the purposes for such authorization indicates only that authorization under § 63–11–211(b)(5) enables an out-of-state psychologist to serve as an expert witness, among other activities, incident to his or her performance of the functions of a psychologist or a health care provider. Since Dr. Martell's appearance as an expert witness did not involve either of these two functions for which written authorization must be obtained, § 63–11–211(b)(5) did not apply. We conclude, therefore, that the trial court did not abuse its discretion or condone a crime in allowing Dr. Martell to testify or in considering his testimony. Since Dr. Martell was not an illegal witness, the appellant's claim that his constitutional rights were violated is totally without merit.

## Reliability of Scientific Proof

■■■ Next the appellant challenges Dr. Martell's conclusion that the appellant was malingering because the reliability of the psychological tests used by Dr. Martell, specifically the MCMI3, the SIRS, the MMPI and the MMPI–2, has never been specifically evaluated for death row inmates. He contends that the admission of such "misleading" and unreliable evidence rendered the hearing fundamentally unfair and violated the Fifth, Sixth, Eighth, and Fourteenth Amendments to the United States Constitution. His specific complaint about these tests is that (1) they have not been subjected to peer review for their validity in determining malingering in death row inmates; (2) they have not been tested to determine their scientific validity for determining malingering in death row inmates; and (3) the rate of error for these tests has not been established for death row populations. We reject the appellant's claim that the results of standard psychological testing performed for the purpose of determining whether a death row inmate is competent to be executed are unreliable unless specif-

ically validated by scientific studies among the death row population.

██ Generally, the admissibility of evidence is governed by standards of relevancy and reliability. *State v. Begley,* 956 S.W.2d 471, 475 (Tenn.1997); Tenn. R. Evid. 402. The admissibility of expert and scientific evidence in particular is governed by Rules 702 and 703 of the Tennessee Rules of Evidence. Under Rule 702, "[i]f scientific, technical, or other specialized knowledge will substantially assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise." Under Rule 703, the facts or data underlying the expert's opinion must be "of a type reasonably relied upon by experts in the particular field in forming opinions or inferences upon the subject," and trustworthy. As we stated in *Van Tran* and reiterate in this opinion, the rules of evidence should not be applied in competency hearings to limit the admissibility of reliable evidence that is relevant to the issue of the prisoner's competency. 6 S.W.3d at 271. In this instance, however, the purposes of Rules 702 and 703 are consistent with this policy since these rules and the procedure adopted in *Van Tran* share a common goal of ensuring that scientific evidence admitted at a competency hearing is both reliable and relevant to "the fact in issue."

This Court set the standards governing admissibility of expert scientific proof in Tennessee in *McDaniel v. CSX Transp. Inc.,* 955 S.W.2d 257 (Tenn.1997): [17]

In Tennessee, under the recent rules, a trial court must determine whether the evidence will substantially assist the trier of fact to determine a fact in issue and whether the facts and data underlying the evidence indicate a lack of trustworthiness. The rules together necessarily require a determination as to the scientific validity or reliability of the evidence. Simply put, unless the scientific evidence is valid, it will not substantially assist the trier of fact, nor will its underlying facts and data appear to be trustworthy, but there is no requirement in the rule that it be generally accepted.

Although we do not expressly adopt *Daubert,* the non-exclusive list of factors to determine reliability are useful in applying our Rules 702 and 703. A Tennessee trial court may consider in determining reliability: (1) whether scientific evidence has been tested and the methodology with which it has been tested; (2) whether the evidence has been subjected to peer review or publication; (3) whether a potential rate of error is known; (4) whether, as formerly required by *Frye,* the evidence is generally accepted in the scientific community; and (5) whether the expert's research in the field has been conducted independent of litigation.

Although the trial court must analyze the science and not merely the qualifications, demeanor or conclusions of experts, the court need not weigh or choose between two legitimate but conflicting scientific views. The court instead must assure itself that the opinions are based on relevant scientific methods, processes, and data, and not upon an expert's mere speculation.

*McDaniel,* 955 S.W.2d at 265.

██ The decision to admit scientific evidence is within the discretion of the trial

---

**17.** The appellant suggests that the appropriate standard for determining the admissibility of scientific expert proof was defined by the United States Supreme Court case of *Daubert v. Merrell Dow Pharmaceuticals,* 509 U.S. 579, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993). We note, however, that *Daubert* dealt with the admissibility of scientific and expert proof under the Federal Rules of Evidence. In *McDaniel,* we noted that our own rules of evidence are narrower than the corresponding federal rules. While acknowledging the general principles espoused in *Daubert,* we declined to adopt *Daubert* and held that admissibility would ultimately be determined under Tenn. R. Evid. 702 and 703. The appellant has cited no authority requiring the adoption of *Daubert* as a prerequisite of affording due process in a competency to be executed hearing under *Ford.*

court and will not be disturbed absent an abuse of discretion. *Begley,* 956 S.W.2d at 475. We find that the psychological tests in question were relevant to a determination of the appellant's competency to be executed. Furthermore, Dr. Martell was clearly qualified to administer this battery of tests and form an opinion as to the significance of the results of those tests. In addition, these types of standardized tests have long been recognized as scientifically valid and reliable, thus meeting the requirements outlined in *McDaniel,* and *Van Tran. See, e.g., State v. Blanton,* 975 S.W.2d 269, 278 (Tenn.1998); *State v. Payne,* 791 S.W.2d 10, 17 (Tenn.1990). Indeed, the reliability of these tests is further illustrated by the fact that the appellant's rebuttal expert witness, Dr. Walker, had administered almost exactly the same battery of tests as those administered by Dr. Martell.

 That is not to say that the fact these tests have not been tested for their reliability in the death row population is wholly irrelevant. Indeed, at the competency hearing the appellant presented the testimony of Dr. Merikangas, who disputed whether the tests Dr. Martell administered could be used to support a finding of malingering because they had not been subjected to peer review or evaluated for validity in the context of determining malingering in the death row population.[18] In light of the conflicting scientific views between Dr. Martell and Dr. Merikangas, the critical inquiry here is not the admissibility, but the weight to be given to Dr. Martell's testimony. As we noted in *McDaniel,* "the weight to be given to stated scientific theories, and the resolution of legitimate but competing scientific views, are matters appropriately entrusted to the trier of fact." In this instance, the trial court gave this evidence of malingering little, if any, weight, choosing instead to focus on the critical inquiry mandated by *Van Tran,* whether "the prisoner lacks the mental capacity to understand the fact of the impending execution and the reason for it." *Van Tran,* 6 S.W.3d at 266. We find no abuse of discretion in allowing testimony concerning this psychological testing into evidence and hold that its admission did not violate due process.

### Denial of Continuance—Rebuttal Proof

At the end of the presentation of his rebuttal proof, the appellant moved for a continuance to allow him to obtain additional rebuttal proof. The appellant pointed out that the State's experts had been able to remain in the courtroom when the appellant's behavior became disruptive and were able to testify about the appellant's conduct. The appellant suggested that his experts had not been able to remain in the courtroom because of the demands of their private practice of psychiatry. The appellant therefore requested a continuance to allow his appointed experts to review the media videotapes of the hearing, which reflected the appellant's disruptive behavior. After they reviewed the tapes, the appellant intended to call the experts and allow them to provide testimony about their assessments of the appellant's behavior.[19] The trial court denied the appel-

---

18. We note that in his report, Dr. Merikangas stated that he had relied upon the neuropsychological testing performed by defense expert Dr. Walker to reach his diagnosis, which was ironically, almost identical to the testing done by Dr. Martell.

19. Both the State and the appellant asked the trial court to order the media to turn over copies of any videotapes of the competency proceeding so the videotapes could be made Exhibit 15 to the record on appeal to enable this Court to review the appellant's behavior during the hearing. The trial court granted

the joint motion. However, when the record was initially filed with this Court, not all of the media videotapes were included, and the appellant made a motion asking this Court to order that the record be supplemented with the remaining media videotapes. This Court denied the motion in a summary order. Thereafter, the Clerk of the Appellate Court received from the trial court the additional videotapes that initially had been missing from Exhibit 15. However, this Court has not reviewed the videotapes because Tennessee Supreme Court Rule 30(I) specifically states:

lant's motion for a continuance, and the appellant asserts that the trial court's ruling deprived him of his right to a fundamentally fair proceeding in violation of the Fifth, Sixth, Eighth and Fourteenth Amendments to the United States Constitution.

■ As previously stated, a trial court's denial of a motion for continuance will be reversed only upon a showing of abuse of discretion. *Cazes*, 875 S.W.2d at 261. The appellant has failed to demonstrate how the trial court abused its discretion in this case. Any need for a continuance was largely caused by the appellant's failure to ask his expert witnesses to adjust their schedules so that they would be able to remain in the courtroom during the presentation of the proof. The trial court did not abuse its discretion in denying the appellant's motion.

■ Moreover, the trial court's ruling did not deny the appellant his right to due process. The trial court did not deny the appellant an opportunity to present rebuttal proof on this issue. In fact, the record reflects that Dr. Merikangas was present in the courtroom during at least part of the time that the appellant was engaging in disruptive conduct. Indeed, Dr. Merikangas was called to make an offer of proof about the detrimental medical effects that possibly could result if the trial court used a gag to restrain the appellant. At no point while Dr. Merikangas was testifying about the potential medical risks did the appellant's counsel attempt to elicit testimony from Dr. Merikangas about his assessment of the appellant's disruptive conduct. The trial court certainly did not foreclose such questioning as is evidenced by the appellant's questioning of Dr. Walker about his assessment of the appellant's

disruptive courtroom behavior and whether that behavior was consistent with malingering. The trial court allowed this questioning and Dr. Walker's testimony even though Dr. Walker had obtained his information about the nature of the appellant's disruptive behavior from television and newspaper accounts of the hearing. A review of the record indicates that the appellant's claim that his due process rights were violated by the trial court's refusal to grant his motion for a continuance is without merit.

### Denial of Adversarial Hearing

Finally, the appellant complains that he was denied his due process right to an adversarial hearing when the trial judge "took it upon himself to gather the evidence for his determination of the facts." The appellant argues that *Ford* and *Van Tran* require that the competency proceeding be conducted in accordance with the "adversary process" which requires that the finder of fact consider only the proof presented to it by the parties. The appellant says that the trial court in this case employed an "inquisitorial" system under which the court is responsible for eliciting the facts. In support of this argument, the appellant points to the following comments made by the trial court:

> This Court is certainly going to follow the rules of evidence in this case. But, I want you lawyers to know that the main objective of the Court is to find out what it needs to find out to make an honest and straightforward ruling. And to do that, I'm going to try to get as much information as I can. I'm the finder of fact and law in this case. And we're not in a trial. We're not in-I think at this point in this case, in this hearing, that

"None of the film, videotape, still photographs, or audio recordings of proceedings under this Rule shall be admissible as evidence in the proceeding out of which it arose, any proceedings subsequent and collateral thereto, or upon any retrial or appeal of such

proceeding." In other words, as a matter of law, the videotapes have never been properly a part of the record of this proceeding, despite the agreement of the State and the acquiescence of the trial court.

this Court is going to be put in a position where I'm going to allow much latitude about all the information that I'm going to receive. In other words, I want everything I can get in my hands to look at before I make a determination on this. And the point I'm trying to make is, I don't want anything hidden from the Court by either side. And I'm not suggesting that. I'm just saying that many times in trials, there's certain things that are not legally admissible. And sometimes there are things that the Court needs to look at, in this type case, that might be legally admissible and might not. And I don't know whether I'm getting—making myself clear to you folks, or not. But what I'm trying to say is, I want everything to look at, if I can, on this. Every possible thing that we can get. And I'm looking at discovery in a situation where, certainly, you lawyers have to be advocates. But this Court, as a finder of fact, has to have that discovery itself, to look at in this particular situation.

■ We disagree with the appellant's contention. In our view, these comments illustrate that the trial court had a clear understanding of the purpose and nature of the competency to be executed proceeding. In fact, it is the appellant who has consistently misconstrued the nature of the proceeding and attempted to attach to it the full panoply of trial rights. Contrary to the appellant's argument, there is no language in *Ford* or *Van Tran* requiring the "adversary process." Instead, both those decisions require that the hearing be "adversarial" in nature. In other words, both the State and the prisoner must be given an opportunity to present proof and argument relevant to the issue of competency as well as an opportunity to challenge the proof presented by the other side.

The use of the term "adversarial" in *Ford* can be correctly understood only by remembering that the Court in *Ford* was considering the Florida procedure for determining competency, a procedure which had completely precluded *any* prisoner participation in the competency determination. Read in context, the term "adversarial" was used in *Ford* to mean that the prisoner must be allowed to participate in the competency determination. In fact, contrary to the appellant's argument, the plurality opinion in *Ford* cites, as a potentially satisfactory procedure for determining competency to be executed, the "inquests" that are used to determine whether the defendant is competent to stand trial and whether a person should be involuntarily committed. *See* 477 U.S. at 417 n. 4, 106 S. Ct. at 2605 n. 4. Clearly, Justice Powell believed that "ordinary adversarial procedures" were not necessary to a valid determination of competency to be executed. 477 U.S. at 426, 106 S.Ct. at 2610. Likewise, contrary to the appellant's suggestion, *Van Tran* requires only that the competency proceeding be adversarial in nature, affording to both the prisoner and the State an opportunity to present evidence, to challenge and clarify opposing evidence, and to be heard on the issue.

■ There is no question that the competency proceeding in this case was conducted in an adversarial manner. The appellant was afforded an opportunity to present his own proof, challenge the State's proof, and be heard on the issue. Contrary to the appellant's argument, the trial court in this case should be commended, not condemned, for attempting to review and consider all relevant information before making a final determination of the issue. *See Weeks*, 52 F.3d at 1561–62 (expressing admiration for the trial court's "active intervention" in questioning the prisoner directly to assist the trial court in making the competency determination). The purpose of a competency proceeding is to accurately determine the issue. Where

as here the prisoner is given the opportunity to review, challenge, and rebut all the information considered by the trial court, there is no due process violation of the right to have the proceeding conducted in an adversarial manner. This issue is without merit.

## V.

### CONCLUSION

Having carefully reviewed de novo each of the legal claims raised by the appellant, a majority of this Court concludes that none have merit. In addition, each member of this Court has thoroughly reviewed the record in this appeal and a majority concludes that the evidence fully supports and does not preponderate against the trial court's finding that the appellant is presently competent to be executed. Accordingly, we affirm the decision of the trial court.

This opinion is not subject to rehearing under Tennessee Rule of Appellate Procedure 39, and the Clerk is directed to certify this opinion as final and immediately issue the mandate. As provided by this Court's order of December 15, 1999, the Warden of the Riverbend Maximum Security Institution, or his designee, shall carry out the appellant's execution in accordance with Tennessee law on the 23rd day of March, 2000, unless a stay is entered by this Court or by a federal court. Counsel for Robert Glen Coe shall provide to the Office of the Appellate Court Clerk in Nashville a copy of any order staying this execution. The Clerk shall expeditiously furnish a copy of any stay order to the Warden of the Riverbend Maximum Security Institution.

ANDERSON, C.J., HOLDER and BARKER, JJ., concur.

BIRCH J., filed a separate dissenting opinion.

## APPENDIX

(February 2, 2000 Order
of the Trial Court)

IN THE CRIMINAL COURT OF
TENNESSEE
FOR THE THIRTIETH JUDICIAL
DISTRICT
AT MEMPHIS, TENNESSEE
DIVISION III

Robert Glen Coe, Petitioner,

v.

State of Tennessee, Respondent.

**FINDINGS OF FACT AND CONCLUSIONS OF LAW ON PETITION TO DECLARE ROBERT GLEN COE MENTALLY INCOMPETENT TO BE EXECUTED**

JOHN P. COLTON, Jr., Judge.

This matter comes before this Court on a PETITION TO PROHIBIT EXECUTION UNDER COMMON LAW, *FORD V. WAINWRIGHT,* 477 U.S. 399, 106 S.Ct. 2595, 91 L.Ed.2d 335 (1986) AND THE TENNESSEE CONSTITUTION, filed by Petitioner, Robert Glen Coe. Petitioner cited all applicable law, including common law, the Sixth, Eighth, and Fourteenth Amendments to the United States Constitution, *Ford v. Wainwright,* 477 U.S. 399, 106 S.Ct. 2595, 91 L.Ed.2d 335 (1986), and Article I §§ 6, 8, 9, 13, 15, 16, 17, 20 & 32 of the Tennessee Constitution as authority for filing his petition.

### BACKGROUND

Petitioner was convicted of first-degree murder, aggravated rape, and aggravated kidnaping in the Criminal Court of Shelby County on February 28, 1981. He was sentenced to death on the murder charge, and to life imprisonment on the remaining charges. The Tennessee Supreme Court affirmed the conviction and sentence, *State v. Coe,* 655 S.W.2d 903 (Tenn.1983), and the United States Supreme Court denied certiorari. *Coe v. Tennessee,* 464 U.S. 1063, 104 S.Ct. 745, 79 L.Ed.2d 203 (1984).

Petitioner filed three petitions for post-conviction relief, and two petitions for habeas corpus relief. Ultimately, both Petitioner's conviction and sentence were upheld.

On December 15, 1999, the Supreme Court of Tennessee issued an order holding that the Petitioner had exhausted the standard three-tier appeals process, and set an execution date of March 23, 2000 for the Petitioner. The Court also held that the time was ripe for Petitioner to challenge his present mental competency to be executed, and remanded the issue to this Court, where the Petitioner was originally tried and sentenced, in accordance with the procedures to determine present mental competency to be executed adopted by the Supreme Court in *Van Tran v. State*, 6 S.W.3d 257 (1999). See *Coe v. State*, 17 S.W.3d 191 (1999).

The Petitioner filed a Petition to Prohibit Execution Under Common Law, *Ford v. Wainwright*, 477 U.S. 399, 106 S.Ct. 2595, 91 L.Ed.2d 335 (1986) and the Tennessee Constitution on December 29, 1999. In his Petition, Petitioner alleged that in light of his present mental incompetency it would be unconstitutional to carry out his death sentence. The Petition alleged that over the past 25 years, Petitioner has been found to be insane and incompetent, and listed several of the various diagnoses the Petitioner has been given by numerous mental health professionals. The Petition also alleged that Petitioner has been treated with a plethora of anti-psychotic, anti-seizure, anti-anxiety, and antidepressant medications. The Petition further alleged that Petitioner currently suffers from debilitating mental illness, and that the stress of his upcoming execution date will only serve to exacerbate his mental illness and increase his psychotic symptoms. Attached to the Petition was the affidavit of Dr. William Kenner, M.D.. In his affidavit, Dr. Kenner opined that Petitioner was not competent to be executed.

Finding that Petitioner had met the required threshold showing that his competency to be executed was genuinely in issue, in accordance with *Van Tran*, this Court issued an order granting in part and denying in part the above referenced petition. In its order, filed January 3, 2000, this Court granted Petitioner's request that this Court hold a hearing to determine the present mental competency of Petitioner to be executed. The evidentiary hearing began on January 24, 2000, and lasted until January 28, 2000.

## BASIS FOR RELIEF

Petitioner asks that this Court find him presently mentally incompetent to be executed and in support of this request asserts the following:

Petitioner does not meet the cognitive test set forth in *Van Tran v. State*, and is therefore incompetent to be executed and in support of this would show that Petitioner has a history of mental illness, incompetence and insanity, and that at present, Petitioner is exhibiting signs of mental incompetence.

## CONCLUSIONS OF LAW

Before *Van Tran*, Tennessee did not have any statutory or common law procedure for litigating the issue of present competency to be executed. *Van Tran*, 6 S.W.3d at 260. The procedures governing the determination of whether a prisoner is presently mentally competent to be executed were adopted and set forth by the Tennessee Supreme Court in *Van Tran v. State*. Under the law of Tennessee, a prisoner is not competent to be executed if the prisoner lacks the mental capacity to understand the fact of the impending execution and the reason for it. This standard is called the "cognitive test." *Van Tran*, 6 S.W.3d at 266. Petitioner now asks this Court to find that he is presently mentally incompetent to be executed.

At the outset, this Court notes that at the competency hearing, the prisoner is

presumed to be competent to be executed. *Id.*, at 270; citing *Ford v. Wainwright,* 477 U.S. 399, at 426, 106 S.Ct. 2595, 91 L.Ed.2d 335 (1986); *State v. Harris,* 114 Wash.2d 419, 789 P.2d 60, at 67 (1990). To prevail, the prisoner must overcome the presumption of competency by a preponderance of the evidence. *Van Tran,* 6 S.W.3d at 271. Furthermore, although likely based on expert medical and mental health testimony, the ultimate question as to whether the prisoner is competent to be executed is a question of fact. *Id.*, citing *Ford,* 477 U.S. at 412, 106 S.Ct. 2595. This Court will now discuss the evidence presented to it in Petitioner's competency hearing in accordance with the standards delineated in *Van Tran.*

This Court first heard testimony from Dr. James R. Merikangas, M.D.. Dr. Merikangas was appointed by this Court to evaluate the Petitioner at Petitioner's request. Dr. Merikangas had an extensive and impressive curriculum vitae, and was accepted by this Court as an expert in the fields of neurology, neuropsychiatry, and psychiatry. This Court found him to be both a competent and credible witness.[1]

On direct examination, Dr. Merikangas testified that he had utilized the past mental health records of Petitioner in his assessment of Petitioner. In addition, Dr. Merikangas performed a physical examination of Petitioner, had magnetic resonance imaging (MRI) tests as well as positron emission tomogram (a PET scan) run on Petitioner,[2] had talked to Petitioner's sisters, and had given Petitioner an oral interview. From these various physical

tests, Dr. Merikangas determined that Petitioner has congenital brain damage, maldevelopment, and probably some acquired brain damage.[3] From his oral interview of Petitioner, Dr. Merikangas opined that Petitioner has delusions and hallucinations, as well as disorders of movement. He further opined that Petitioner's peculiarities of thinking were symptomatic of schizophrenia, and testified that his diagnosis of Petitioner was that he was a chronic paranoid schizophrenic,[4] and that this schizophrenia causes Petitioner to be incompetent to be executed.

In support of his diagnosis of chronic paranoid schizophrenia, Dr. Merikangas testified that the fact that Petitioner has elected to stay in his cell in the jail where he is housed, rather than to be part of the prison population was one factor he considered. Dr. Merikangas testified that he also considered Petitioner's prison records dating from 1981 to the time of the hearing which document "wild episodes where he [Petitioner] will wind up on one medication or another." Some other contributing factors in Dr. Merikangas' diagnosis were Petitioner's nicotine addiction, as well as the amount of coffee he drinks, and his pariphilia, e.g., tendency to masturbate in public.[5] When questioned as to whether he felt the Petitioner was malingering, Dr. Merikangas indicated that he felt Petitioner was not. Dr. Merikangas further opined that if Petitioner was lucid for a time, or was in a period of remission from his schizophrenia, given the impending stress of an execution, Petitioner would dissociate to such a point that he would be incompetent to be executed under Tennessee law.[6]

---

1. The Court notes that Dr. Merikangas' credibility was somewhat diminished by some statements made during cross examination that blatantly contradicted those elicited on direct, as well as a showing by Dr. Merikangas of bias and unwillingness to cooperate with State's attorney on cross.

2. Dr. Merikangas testified that while the MRI scan showed abnormalities in the structure of

Petitioner's brain, Petitioner's PET scan was normal.

3. Transcript of the proceedings, January 24, 2000, Volume I, page 90, lines 9–11.

4. Id., at page 111, lines 10–23.

5. Id., at page 115, lines 1–20.

6. Id., page 124, lines 19–25.

When questioned about Petitioner's other expert witness, Dr. William Kenner, and his diagnosis that Petitioner suffers from Dissociative Identity Disorder (DID), Dr. Merikangas testified that the diagnosis of DID was consistent with his diagnosis of schizophrenia.[7]

Dr. Merikangas was next questioned as to his opinion of the diagnoses of the State's Court appointed experts. Dr. Merikangas expressed contempt for both of the State's experts, and described their methods of evaluating Petitioner[8] along with their findings as invalid, not credible, and as "junk science."[9] Dr. Merikangas also commented several times on the fact that Dr. Martell spent only seven hours with Petitioner, an amount of time he felt insufficient to reach the diagnosis given by State's experts.[10]

When questioned by counsel as to whether Petitioner was competent to be executed in accordance with the *Van Tran* standard, Dr. Merikangas' answer was somewhat unresponsive. Dr. Merikangas appeared to be playing semantic games with the word understanding. Dr. Merikangas testified that Petitioner is aware that he is going to be executed, that Petitioner claims he is innocent of the crime for which he has been convicted and sentenced to die, and that Petitioner claims he is being killed to conceal the identity of the real killer. However, due to Petitioner's unconventional beliefs about reincarnation,[11] Dr. Merikangas concluded that Petitioner does not fully understand the consequences of being executed.[12] Dr. Merikangas went on to explain that because Petitioner maintains he is innocent of the crime, and that he is being killed to conceal the identity of the "real killer", he obviously does not understand the reason he is being executed.[13] Dr. Merikangas further opined that as Petitioner's execution draws near, Petitioner will become even less competent than he is at present.

On cross examination, Dr. Merikangas testified he had seen Petitioner one time for a total of an hour and a half,[14] that the actual notes of his interview composed only one page, and that in fact he generally did not even take notes when interviewing a patient.[15] Regarding his comments about the tests administered to Petitioner by State's experts, specifically that they were not recognized as valid tests to determine malingering, Dr. Merikangas conceded that Dr. Richard Rogers, the foremost expert in the United States on malingering, lists the very tests used by the State's experts as one of the methods to use to determine malingering.[16]

---

7. Id., at page 123, lines 14–18.

8. This Court notes, however, that in his report, Dr. Merikangas states he relied upon the neuropsychological testing performed by Dr. James S. Walker, Ph.D to reach his diagnosis, and ironically, the testing done by Dr. Walker is almost identical to the testing done by Dr. Martell.

9. Id., page 138, lines 14–17.

10. This Court notes that it found Dr. Merikangas' contempt regarding the amount of time spent with Petitioner by State's experts somewhat surprising, in light of the fact that Dr. Merikangas spent a total of only one and one-half hours with Petitioner, a third of which was comprised of the physical examination of Petitioner.

11. Petitioner apparently ascribes to the theories of writer/philosopher Edgar Cayce, in that Petitioner believes he will be reincarnated after his execution and return to earth.

12. This Court disagrees with Dr. Merikangas' opinion that Petitioner's beliefs in reincarnation were delusional. This Court takes judicial notice that reincarnation, while not a Christian belief, is a theory ascribed to by many people besides Petitioner.

13. Transcript of the proceedings, Volume I, page 162, lines 8–25; page 163, lines 1–8.

14. Transcript of the proceedings, Volume II, page 182, lines 6–8.

15. Id., page 183, lines 14–23.

16. Id., page 185, lines 5–25.

When questioned about Petitioner's unusual belief concerning reincarnation as a basis for his determination that Petitioner was incompetent to be executed, Dr. Merikangas testified that this belief was not determinative of whether he was incompetent, but rather the fact that Petitioner is a chronic paranoid schizophrenic[17] was the reason he found him incompetent.[18] Interestingly enough, Dr. Merikangas had previously testified that "you can be schizophrenic and be competent, or you can be schizophrenic and be incompetent."[19]

Upon further questioning by the State, Dr. Merikangas again stated that although Petitioner told him that he did not commit the crime for which he was going to be executed, Petitioner is aware of his impending execution, and that he was sentenced to die for the murder of a young girl. Finally, Dr. Merikangas testified that he agreed with the reports of Dr. Martell, Dr. Matthews, Dr. Auble, Dr. Walker, and Dr. Kenner that Petitioner realizes he was sentenced to die for the murder of a young girl.[20] At this point, the witness became somewhat uncooperative with the State, even refusing to help State's counsel pronounce a medical term when asked for help by State's counsel.[21]

Petitioner's counsel next examined Dr. William Kenner, M.D.. Dr. Kenner also had an extensive and impressive curriculum vitae, and was accepted by this Court as an expert in psychiatry. Dr. Kenner examined Petitioner on four separate occasions. Dr. Kenner testified that he reviewed Petitioner's old medical records, and utilized the reports of Dr. Matthews,

Dr. Martell, and Dr. Merikangas in his evaluation of Petitioner.

Dr. Kenner testified that on his first visit with Petitioner, which took place December 22, 1999, he discovered that Petitioner sometimes "loses time," and further testified that he found him to be incompetent after this initial visit and diagnosed him as a schizophrenic.[22]

Dr. Kenner visited Petitioner a second time on January 10, 2000. At the conclusion of this visit, Dr. Kenner testified that Petitioner was no longer manifesting psychotic symptoms, and that he thought him competent to be executed.[23]

Dr. Kenner's third visit took place January 11, 2000. Dr. Kenner testified that on this visit, Petitioner did not remember the previous night's visit, and that he believed this loss of memory to be genuine. In addition to memory loss, the Petitioner gave a history of his childhood to Dr. Kenner wholly inconsistent with any history previously given. Dr. Kenner testified that after he questioned Petitioner about the death penalty, he became agitated and asked to be taken back to his cell. From this third interview, Dr. Kenner began to think that Petitioner suffered from Dissociative Identity Disorder, hereafter referred to as DID, and opined that he was not competent to be executed.

Dr. Kenner's fourth visit took place on January 12, 2000. At this time, Petitioner showed Dr. Kenner a letter he had received from another prisoner, in which Petitioner was threatened with bodily harm. Petitioner told Dr. Kenner that he had received the letter the previous evening before Dr. Kenner had visited him.[24] Dr.

17. This Court notes here that Dr. Merikangas was the only doctor of six who evaluated Petitioner who ultimately concluded he was a paranoid schizophrenic.

18. Id., page 191, lines 14–20.

19. Id., page 169, lines 2–4.

20. Id., page 201, lines 8–25; page 208, lines 1–6.

21. Id., page 221, lines 12–15.

22. Id., page 298, lines 8–11; page 299, lines 3–13.

23. Id., page 302, lines 1–2.

24. Transcript of the proceedings, Volume III, page 323, lines 17–18.

Kenner testified that this letter was significant in his finding of DID because the letter represented a threat to Petitioner's physical integrity, causing him a great deal of stress, and accordingly, Dr. Kenner felt the stress stirred by the letter produced the period of separate identity exhibited by Petitioner the previous night.[25] In addition to the diagnosis of DID, Dr. Kenner also diagnosed Petitioner as suffering from generalized anxiety disorder, schizoaffective disorder (bipolar type), poly substance abuse, learning disorder, reading disorder, and schizoid personality disorder with anti-social features.

Dr. Kenner went on to testify that during this fourth visit, Petitioner described several instances of having difficulty with his memory. This Court notes here that even in what Dr. Kenner describes as a dissociative period, Petitioner was still able to talk knowledgeably about his attorney Henry Martin, a federal public defender in Nashville who is working on some of Petitioner's federal appeals, as well as attorneys Robert Hutton and Jim Walker, both of whom represented Petitioner in the competency hearing.[26] When questioned if he felt Petitioner was malingering, Dr. Kenner testified that he did not feel that Petitioner was malingering. Dr. Kenner further stated that the tests administered to the Petitioner by the State's expert Dr. Martell, the MMPI–II in particular, were not effective tools to test malingering in death row inmates.

When questioned about his diagnosis of DID and what effect it might have on Petitioner's ability to understand that he was going to be executed and the reason

for it, Dr. Kenner stated that in a dissociated state, Petitioner would not have the mental capacity to understand his upcoming execution.[27] Dr. Kenner further testified that with a reasonable degree of medical certainty, he felt that Petitioner would not be competent to be executed because the upcoming stress of an execution date would cause him to dissociate.[28]

On cross examination, Dr. Kenner admitted that he felt the Petitioner was a manipulative person, so much so that he had advised Dr. Merikangas of the same.[29] Dr. Kenner also testified that he was aware that Petitioner had lied to numerous treating mental health physicians in the past, and had in fact bragged to people that he [Petitioner] could manipulate mental health experts to believe anything he wanted them to believe. However, Dr. Kenner maintained that he felt Petitioner's confusion and loss of memory during his interviews with him was genuine.[30] Dr. Kenner went on to say that Petitioner has an underlying psychotic process of some kind, which could be paranoid schizophrenia, and that when not under stress, he is competent to be executed.[31] Dr. Kenner admitted that on his fourth visit with Petitioner, he found him competent to be executed in accordance with the *Van Tran* standard, although he felt he could dissociate in the future, which would render him incompetent.[32]

This Court, while certainly not an expert in the field of mental health disorders, has some question about the diagnosis of DID. On cross examination, Dr. Kenner stated that a person with DID has two identities, a primary and a secondary. The secondary identity is mani-

25. Id., page 327, lines 3–6.

26. Transcript of the proceedings, Volume II, page 310, lines 8–17.

27. Transcript of the proceedings, Volume III, page 341, lines 16–19.

28. Id., page 344, lines 19–25; page 345, lines 1–8.

29. Id., page 350, lines 18–25.

30. Id., page 357, lines 3–22.

31. Id., page 261, lines 3–19.

32. Id., page 362, lines 1–4.

fested when the first identity is under stress. Of particular interest to this Court was Dr. Kenner's explicit statement that "the secondary identity has no awareness of the primary identity, any of the primary identity's past history, why he is on death row, what is about to happen to him, anything like that." [33] As cited above, during what Dr. Kenner described as a dissociative state for Petitioner, e.g., the overtaking of Petitioner's primary identity by his secondary identity, Petitioner's "secondary identity" was well aware of the names of his "primary identity's" attorneys, both those who represented him in federal court as well as the trial court competency proceedings, and was also aware that he had pending claims in federal court. This Court finds that this is in direct contravention of Dr. Kenner's explanation of DID and how it manifests itself.

At the close of Dr. Kenner's testimony, counsel for the Petitioner rested, and the proceedings were adjourned until the next day, when the State would begin presentation of its case. [34] When the hearing resumed the next morning, the State first called lay witness Sergeant James W. Horton. It was at this point that the Petitioner's behavior became of significant interest to this Court. This Court will first discuss Petitioner's behavior before discussing the testimony of the State's lay witnesses.

From the first day of the hearing, Petitioner attempted to disrupt the competency proceedings. Petitioner made insulting and inappropriate statements to the Court. In addition, Petitioner whistled and banged on chairs with his hands, making such noise that the Court was forced to find a chair comprised only of soft, cushy material for the Petitioner. The Petitioner complained about the chair, and when the Court instructed the bailiffs to leave Petitioner in the "soft chair," Petitioner stated to his attorneys, "Make a note of that. When we appeal it. Take his ass off that bench." [35] Petitioner again addressed the Court regarding the change of his chair, stating to the Court, "...I know why he done it. Because I was using it like this. [simultaneously beating on his lawyer's chair, located beside him] How do you like that? Can you hear that, Judge? Just happen to have one here I can beat on. How's that, Judge?" [36]

This disruptive behavior reached a climax on the third day of the hearing. Upon entering the courtroom, the Petitioner turned to the court gallery and stated, "I ain't doing this to disrespect you all,[37] but I ain't staying here no more. You can either send me back or we're just going to have some problems now." [38]

The Court allowed the first witness of the day, Sergeant James W. Horton, a guard at River Bend where Petitioner is housed, to take the stand. At this point,

33. Id., page 360, lines 12–20.

34. This Court notes that before resting its case, Counsel for Petitioner also introduced testimony in the form of two lay witnesses, both spiritual counselors at River Bend Maximum Security Institution. Both lay witnesses testified that Petitioner has exhibited some form of memory loss in their presence. For example, both witnesses testified that Petitioner had told them he had made a cup of coffee, only to find it cold as ice when he started to drink it. This Court will not discuss their testimony in great detail, as neither was able to render an opinion as to whether Petitioner was competent in accordance with the standard set forth in *Van Tran*.

35. Transcript of the proceedings, Volume I, page 55, line 20–21.

36. Id., page 56, lines 5–9.

37. Proof was later entered into the record in the form of testimony from Charlotte Stout that this statement was directed at the victim's mother, Charlotte Stout. Transcript of the proceedings, Volume V, page 688, lines 14–22.

38. Transcript of the proceedings, Volume IV, page 479, lines 9–12.

the Petitioner began to scream so loudly that both attorneys for the Petitioner and the State were forced to stand directly in front of the witness at the witness chair in order to question him and to hear his responses. Petitioner's screaming consisted of obscenities and threats directed at the Court, the court clerk, the capital case law clerk, the State's attorneys, the witness, and the court reporter.

The Court makes special note here that although obscene, Petitioner's shouting was conversational in that Petitioner responded, albeit in an inappropriate and offensive manner, to statements by the Court in both a logical and coherent manner. His comments were completely in context with what was being said in the courtroom. Petitioner was aware of his situation, and of what was going on around him enough so that he was even able to interject his own responses to questions of the witness asked by counsel before the witness was able to answer.

For example, when Sergeant Horton was questioned as to what his job was at River Bend, the Petitioner interjected, shouting, "He wasn't a goddamn thing. He was a whore." [39] The Petitioner then invited the Court to get mad at him for his antics.

As the Sergeant testified, Petitioner threatened him, even calling him by name at times. For example, the Petitioner stated, "Just remember you got to be back at River Bend whore. You won't have all these goddamn people protecting your ass up there, bitch." [40] Petitioner also stated,

"Oh, you're a lying dick sucking bitch, Horton. And you remember, bitch, I'm going to be back over there [at River Bend]. Don't be trying to hide, you punk..." [41] Several other threatening statements were made to Sergeant Horton over the course of his testimony by the Petitioner in addition to the two statements cited above.

When the Court directed that the proceedings would continue in light of Petitioner's antics, Petitioner elevated his disruptive behavior, shouting to the courtroom, "Can you all hear me, bitch?" [42], then telling the Court, "You'll regret bringing me down here you goddamn Judge Judy want to be." [43]

At this point in the proceedings, Petitioner, calling Attorney General Glen Pruden by name and addressing Mr. Pruden's status as an attorney for the State, began spitting on Mr. Pruden, and Mr. Eric Dabbs, another attorney for the State. Due to the spitting, the State suggested, and the Court so ordered, that the Petitioner be gagged, in accordance with the United States Supreme Court case of *Illinois v. Allen*, 397 U.S. 337, 90 S.Ct. 1057, 25 L.Ed.2d 353 (1970). [44] Because the Court felt that the Petitioner should be present in the courtroom for his competency proceedings, the Court felt that gag restraints would be an appropriate measure, given the Petitioner's behavior.

While making its ruling regarding the gag restraint, Petitioner interrupted the Court shouting, "Gag coming up." [45] The Petitioner further informed the Court that he would continue to "holler" until the

---

39. Id., page 485, lines 2–10.

40. Id., page 490, lines 17–20.

41. Id., page 581, lines 2–5. The Court notes that these are but two of a plethora of statements and threats made to Sergeant Horton by the Petitioner.

42. Id., page 492, lines 21–22.

43. Id., page 493, lines 9–10.

44. The Court notes that Petitioner's attorneys objected to gag restraints because they felt it to be both a health risk, and a determination by this Court that Petitioner's behavior was willful. The Court further notes that a paramedic applied the restraints, and was present in the courtroom at the request of the Court, no more than five feet from the Petitioner, in the event that Petitioner required medical attention.

45. Id., page 511, line 10.

Court ordered the gag,[46] and that the gag would not stop him from making noise; that he would just hum real loud once gagged.[47]

Indeed, the Petitioner lived up to his promise. After being gagged with gauze, the Petitioner found and made evident to the Court that he was still able and would continue to shout and disrupt the hearing, stating, "Fuck you, bitch. You hear that whore. I can still holler, bitch," [48] and, "Think you can shut me up. Fuck you, bitch." [49]

Shortly after they were applied, Petitioner was able to remove his gauze restraints, and new gag restraints in the form of medical tape were applied across the Petitioner's mouth. These too proved to be of little value in keeping the Petitioner quiet. It became obvious to the Court that the Petitioner would not calm his antics, as he had disrupted the proceedings for over three hours. At this point, the Court determined that Petitioner had waived his right to be present in the courtroom. A discussion was held side bar where the Court indicated to all attorneys that because Petitioner's behavior was so disruptive of the proceedings, a separate room with a closed circuit television would be provided to Petitioner after the lunch break in which he could view the remainder of the competency proceedings, and it

was so ordered.[50] Petitioner addressed the Court and its ruling, stating, "...I won. You're going to send me out of here, bitch. You're a weak mother fucker..." [51]

Before he was sent out of the courtroom, however, Petitioner made several statements in addition to those cited above that were of particular interest to this Court, in that they suggest Petitioner was cognizant of his situation and his surroundings, what the purpose of the competency hearing was, who the State's attorneys were, and their role in the hearing. Petitioner also illustrated that he was familiar with the court process, the appeals process, and even some rules of evidence.

For example, addressing the Court, Petitioner stated, "You better send me back to River Bend...I didn't ask to come here in the first place...You want to know if I'm crazy, you should have asked me...," [52] and, "You know goddamn well you're going to tell them ain't nothing wrong with me so what the ... you waiting for?" [53] Petitioner also stated, "Old Judge Nixon is going to fuck your ass up punk. Everything you say and do is going to get overturned. This is a waste of...time and money here...You just wanted to be on TV." [54] Again referring to Judge Nixon, Petitioner stated, "...You just going to let that federal judge overrule your...ass. That's all you're do-

---

46. Id., page 513, lines 19–20.

47. Id., page 518, lines 7–9.

48. Id., page 531, lines 16–17.

49. Id., page 545, lines 24–25.

50. The Court notes here that Larry Nance, one of Petitioner's attorneys, was required by this Court to be present with Petitioner at all times in the room where Petitioner viewed the proceedings through closed circuit television. In addition, this Court allowed Petitioner's attorneys Jim Walker and Robert Hutton to go back to the "closed circuit viewing room" to confer with Mr. Nance and Petitioner after each witness.

51. Id., page 565, lines 23–25.

52. Id., page 586, lines 13–17.

53. Id., page 587, lines 1–3.

54. Id., page 568, lines 5–9. The Court notes that Petitioner was referring to Judge John T. Nixon, Federal Judge, who has had much contact with Petitioner's federal claims, and who issued an opinion ten days prior to the beginning of Petitioner's competency hearing, holding that Petitioner could pursue a "Ford" claim, challenging both his competency to be executed and the adequacy of state procedures used to determine his competency to be executed, in a separate habeas corpus petition in the United States District Court for the Middle District of Tennessee.

ing," [55] and, "Hey, don't worry about it. Judge Nixon is going to overturn anything that punk says. And he knows it, too." [56] Finally, again in reference to the appeals process, Petitioner stated, "Fuck you, Judge Colton...you know the federal court's going to over turn your ass...no matter what you rule..." [57] Petitioner then made reference to the trial court judge who initially tried his case, Judge William Williams, calling him by name.[58] Also of interest to this Court, when Sergeant Horton was questioned about when and how medication is distributed to inmates at River Bend, Petitioner shouted, "...He can't testify about what somebody else saw. Do your goddamn job, you fucking shit son of a bitch lawyer..." [59]

Again, although obscene, and certainly inappropriate in a courtroom setting, what became obvious to this Court was that Petitioner's behavior was a deliberate attempt to disrupt the competency proceedings. Petitioner did not want to be in the courtroom, and made concerted efforts to have himself removed.

Petitioner's attorneys assert that this behavior was not willful, but rather an involuntary result of his mental defects. This Court can not agree with this assertion. This Court realizes that Petitioner certainly may have some personality disorder, as attested to by several of the mental health experts. However, there was also testimony from the doctors that a person could have a personality disorder, a mental disease, or even brain damage, and still be competent, or aware of his actions.

This Court finds that Petitioner's behavior was willful, and that he behaved in such a fashion for no other purpose than to disrupt the competency proceedings. Furthermore, although not dispositive of the issue of Petitioner's present mental competency to be executed, Petitioner's behavior served as a strong indicator to this Court that Petitioner was cognizant of the reason he was in court and what the purpose of the proceedings was, and that he was aware of the various people in the courtroom and the role each served in the proceedings. Again, while Petitioner's antics were unpleasant, vile and disruptive, they did not appear to be involuntary reactions. The Petitioner did not engage in incoherent rambling. To the contrary, the Petitioner made pointed and responsive remarks. The fact that this behavior was not beyond the Petitioner's control was further made evident to this Court when subsequent to his removal from the courtroom, the behavior immediately ceased. This includes his removal to the holding cell directly adjacent to the courtroom where his gag restraints were applied, as well as the separate viewing room. Indeed, once the Petitioner was removed to his separate viewing room, no further outbursts from Petitioner were reported

Once the proceedings resumed, the State called three more guards from River Bend to testify. As with the Petitioner's lay witnesses, the testimony of the State's lay witnesses will not be discussed in great detail. The gist of the lay witness testimony was that Petitioner was not a behavior problem in jail. In fact one guard stated he wished he had a hundred prisoners just like him. Each of the guard witnesses testified that they had never seen Petitioner in a dissociated state. To the contrary, the witnesses testified that Petitioner was friendly most of the time, and was responsive when greeted, sometimes calling the guards by name. However, as with Petitioner's lay witnesses, none of the State's lay witnesses could render an opinion as to whether Petitioner was competent in accordance with the *Van Tran* standard.

**55.** Id., page 577, lines 14–16.

**56.** Id., page 588, lines 19–21.

**57.** Id., page 598, lines 14–19.

**58.** Id., page 569, lines 9–14.

**59.** Id., page 572 lined 13–16.

The next expert to be called was State's expert Dr. Daryl B. Matthews, M.D., Ph. D..[60] As with the previous experts, Dr. Matthews had an extensive and impressive curriculum vitae, and was accepted by this Court as an expert in forensic psychiatry. This Court found him to be a competent and credible witness.

On direct examination, Dr. Matthews testified that the components of his psychiatric evaluation of Petitioner consisted of a detailed psychiatric history, which included inquiries about many different life areas, and a mental status examination, which included an assessment of Petitioner's current mental functioning. In addition, Dr. Matthews testified that he had questioned Petitioner extensively about his knowledge of his impending execution and the reason he was to be executed. Dr. Matthews stated that he had spent a total of five hours with Petitioner.[61]

Dr. Matthews testified during his examination, he learned a great deal about Petitioner, and went into extensive detail with this Court about his findings. Dr. Matthews testified that Petitioner gave him a personal history consistent with that given to other mental health professionals. Dr. Matthews testified that he noted the constant tremor Petitioner exhibited, and he pointed this out to Petitioner. Petitioner told Dr. Matthews that he has always had the tremors, that he does not like sitting still, and that he feels better when moving.[62]

Dr. Matthews testified that Petitioner told him he remains in his cell most of the time and chooses not to take exercise because he fears the other inmates.[63] Dr. Matthews testified that he talked with Petitioner a bit about this fear, and that Petitioner explained that his fear of inmates was due in large part to Petitioner's awareness of the repugnance in which his offense is held by other inmates. Dr. Matthews also testified that Petitioner told him he is unhappy with his lawyers' attempts to prove him crazy rather than trying to prove him innocent.[64]

Dr. Matthews testified that when questioned about his understanding of death, Petitioner understood what the death of the body is. Petitioner told Dr. Matthews that he believes that there is a soul and that it goes somewhere. Dr. Matthews further testified that Petitioner expressed his belief in reincarnation to him in extensive detail, and stated that his views on reincarnation are those of Edgar Cayce.[65] Petitioner stated to Dr. Matthews that he did not "get" these views from Cayce, but that Cayce essentially echoed his views.[66]

In further reference to his understanding of death, Dr. Matthews testified that Petitioner related that he had expressed an interest in organ donation, specifically, his eyeballs, but that the warden would not allow him to do so. Dr. Matthews testified that Petitioner stated to him that he thought that once you die, you die, and the body was no longer of any use, so he was

60. Before calling Dr. Matthews, the State called Mrs. Charlotte Stout to the stand and Mrs. Stout read a letter purportedly written to her by the Petitioner. This Court found that there was circumstantial evidence that the letter was written by Petitioner. However, this Court felt that the letter had little relevance to Petitioner's competency, and the letter was not considered in this Court's determination of Petitioner's competency to be executed.

61. Transcript of the proceedings, Volume V, page 710, lines 11–24.

62. Id., page 717, lines 6–16.

63. Id., page 727, lines 3–6.

64. Id., page 730, lines 15–20.

65. Id., page 732, lines 5–25.

66. Id., page 733, lines 1–9. Dr. Matthews explained that Edgar Cayce is a famous American prophet and fake healer who died in the nineteen forties, and who has written scores of books and sold millions of copies of said books.

curious as to why the warden would not allow his eyes to be used.[67]

Dr. Matthews testified that when he questioned Petitioner about his execution, Petitioner told him that he does believe he will be executed. Dr. Matthews also testified that Petitioner told him that he was given a paper in which he was asked to choose his method of execution, and that he had chosen "the needle." Petitioner further informed Dr. Matthews that his lawyers were angry at him when he chose a method, and that they [his lawyers] told him not to sign any papers. Dr. Matthews testified that Petitioner was irritated by his lawyers' instructions, and stated that he was a grown man and could sign anything he wanted to.[68]

Dr. Matthews testified that when he questioned Petitioner about his competency hearing, Petitioner stated that he understood that a hearing was going to be held on the issue of his competency, and that he did not want to go.[69]

Dr. Matthews testified that Petitioner is aware that he is alleged to have killed a girl, but that Petitioner minimized the seriousness of the offense and stated that people get murdered all the time. Dr. Matthews testified that when he asked Petitioner if he was convicted or found guilty of that murder, he said he was not, because in order to be found guilty, one must in fact be guilty, and he is innocent. Dr. Matthews testified that he questioned him further on this issue, and asked him if the judge said he was guilty. Petitioner told Dr. Matthews that the judge said he was guilty and that he was going to die, and that the reason was the murder.[70]

Dr. Matthews testified that Petitioner further expressed his innocence of the crime, stating that the crime was actually committed by a man named Donald Gant, and that both he [Petitioner] and the government have proof that he did not commit the crime.[71] Dr. Matthews testified that Petitioner told him that the witnesses against him changed their stories on the witness stand, that Donald Gant had claw marks on his face, and that Donald Gant had been arrested before for "messing around with kids." Petitioner further stated to Dr. Matthews that his confession was coerced.[72]

Dr. Matthews testified that when he questioned Petitioner about what the effect of a finding of incompetence would be, Petitioner told him that they give you drugs to make you well, and then they kill you.[73]

When Dr. Matthews finished testifying about the information he had received through his interview with Petitioner, he was asked by the State if he had reached any conclusions regarding a diagnosis of Petitioner. Dr. Matthews testified that he diagnosed Petitioner as suffering from pariphilia, not otherwise specified, e.g. exhibitionism, poly-substance dependance in a controlled environment, adjustment disorder with mixed anxiety and depressed mood, nicotine dependance, malingering, possible neuroleptic induced Parkinsonism, noncompliance with medical treatment, antisocial personality disorder, borderline personality disorder, and schizotypal personality disorder.[74]

Dr. Matthews then testified as to how he had reached these various diagnoses. Dr. Matthews stated that the pariphilia was well documented throughout his medical records, and indeed, the Petitioner had

67. Id., page 734, lines 17–22.

68. Id., page 735, lines 9–21.

69. Id., page 735, lines 22–25.

70. Id., page 736, lines 2–19.

71. Id., page 736, lines 20–24.

72. Id., page 737, lines 2–19.

73. Id., page 738, lines 1–4.

74. Id., page 740, lines 6–25; page 741, lines 1–25; page 742, lines 1–23.

also expressed his tendency to masturbate constantly.

Dr. Matthews stated that the adjustment disorder with mixed anxiety could be attributed to Petitioner's living conditions and the fact that he is facing execution.[75]

In regard to the diagnosis that the Petitioner was malingering, Dr. Matthews testified that the diagnosis was based on the assessment of malingering made by countless other professionals in the past, on Petitioner's own admission to Dr. Matthews that he had lied to mental health experts in the past, on Petitioner's performance on the various psychological tests administered by Dr. Martell and Dr. Walker, and on the fact that there has been a highly variable and inconsistent pattern of symptom presentation by Petitioner through the years. Dr. Matthews also stated that malingering is associated with anti-social personality disorder, another diagnosis given Petitioner by Dr. Matthews.[76]

In regard to his diagnosis of anti-social personality disorder, Dr. Matthews testified that some of the factors that contributed to this diagnosis were Petitioner's failure to conform to social norms with respect to lawful behaviors, his deceitfulness as indicated by repeated lying, his impulsivity or failure to plan ahead, his irritability and aggressiveness as documented in his hospital records, his consistent irresponsibility before he was incarcerated, his lack of remorse as indicated by being indifferent to having hurt or mistreated another,[77] and the fact that Petitioner has a long history of being diagnosed with anti-social personality disorder.[78]

Dr. Matthews testified that he also diagnosed Petitioner with borderline personality disorder. He also testified that the symptoms of borderline personality disorder and anti-social personality disorder often overlap. Dr. Matthews further testified that Petitioner's disruptive behavior discussed by this Court above was fairly classic borderline behavior.[79] Dr. Matthews stated that some of the other factors that contributed to this diagnosis were a marked and persistent unstable self-image, which is often confused with multiple personality disorder, impulsivity, recurrent suicidal behavior, affective instability due to a marked reactivity of mood, irritability or anxiety, inappropriate intense anger or difficulty controlling anger, and transient stress related paranoid ideation or severe dissociative symptoms.[80]

When asked to comment on the Petitioner's outburst of the previous day, Dr. Matthews testified that he felt Petitioner was completely in control of his behavior, evidenced by the fact that Petitioner was able to walk into the courtroom quietly, behave with respect toward Mrs. Stout, then sit down and become phenomenally loud and abusive. Dr. Matthews further testified that he found this behavior remarkable because of the extent to which it was accompanied by a complete cognitive awareness of what was going on, evidenced by the fact that Petitioner was able to identify all the participants of his hearing, including people he had not seen in years. Dr. Matthews testified that this cognitive awareness was further evidenced by Petitioner's understanding of the appeals process.[81] Dr. Matthews commented that de-

---

**75.** Id., page 747, lines 8–25.

**76.** Id., page 750, lines 1–25; page 751, lines 1–25; page 752, lines 1–25; page 753, lines 1–25; page 754, lines 1–12.

**77.** Id., page 755, lines 1–18.

**78.** Transcript of the proceedings, Volume VI, page 762, lines 19–20.

**79.** Id., page 769, lines 4–17.

**80.** Id., page 772, lines 4–25; page 773, lines 1–23; page 774, lines 1–22.

**81.** Id., page 780, lines 1–23.

spite his intense display of emotion, it was obvious to him that Petitioner retained a command of the material and understood what was going on, and that this behavior was obviously motivated behavior in that Petitioner did not want to be at the hearing so he made it known.[82]

When questioned about Dr. Merikangas' diagnosis of paranoid schizophrenia, Dr. Matthews testified that he thought it unlikely that Petitioner suffered from schizophrenia.[83] Dr. Matthews testified that he reached this conclusion in part due to the lack of documentation of delusional thoughts by defendant, as well as the fact that Dr. Herbert Meltzer, a foremost expert in the United States in the area of schizophrenia, did not find evidence of schizophrenia in the Petitioner.[84]

When questioned about his opinion of Dr. Kenner's diagnosis of DID for Petitioner, Dr. Matthews stated that he felt it to be the remotest and tiniest possibility he could imagine.[85]

Finally, when questioned as to Petitioner's competency to be executed, Dr. Matthews stated that he believed that Petitioner understands he is going to be executed and that he believed Petitioner understands the reason for it, and that he was therefore competent to be executed in accordance with the standard set forth in *Van Tran*.[86]

On cross examination, Dr. Matthews testified that his practice was a forensic practice, not a general practice, that the last time he had treated a schizophrenic patient was 1990, and that he had never treated anyone with DID.[87] It was further elicited from Dr. Matthews that he was a skeptic about the condition of DID in general.[88] Dr. Matthews also testified that he had not personally verified Petitioner's account of his personal history detailing the abuse he suffered at the hands of his father. Dr. Matthews explained that he did not do this because the account Petitioner gave him was consistent with what was reported in his medical history.[89]

When questioned about his interview with Petitioner, Dr. Matthews testified that Petitioner downplayed his mental illness, but that this was consistent with malingering. Dr. Matthews further testified that he did not feel that anything Petitioner had done was inconsistent with malingering.[90]

Dr. Matthews testified that he agreed with the proposition that if someone is malingering, this does not preclude the existence of physical, psychiatric symptoms or brain damage.[91]

When questioned about the possibility that Petitioner could become psychotic in the future, Dr. Matthews stated that he did not foreclose that possibility, and that if it happened, it could be the result of the devolution of his borderline personality disorder, the result of substance abuse, or the result of faking.[92]

When questioned by Petitioner's counsel about Dr. Merikangas' diagnosis of schizophrenia, and why Dr. Matthews had not commented of any of the neurological signs that Dr. Merikangas said were consistent with schizophrenia, Dr. Matthews stated that he did not comment because there are

82. Id., page 781, lines 1–4.

83. Id., page 786, lines 20–24.

84. Id., page 790, lines 1–17.

85. Id., page 792, lines 18–21.

86. Id., page 799, lines 1–2.

87. Id., page 804, lines 18–23.

88. Id., page 805, lines 21–22.

89. Id., page 810, lines 1–8.

90. Id., page 816, lines 23–25; page 817, lines 1–18.

91. Id., page 817, lines 19–25.

92. Id., page 820, lines 16–25; page 821, line 1.

almost no neurological signs inconsistent with the diagnosis of schizophrenia. Dr. Matthews further stated that schizophrenia is not diagnosed neurologically, and a schizophrenic could have almost any neurological picture.[93]

Dr. Matthews was not questioned on cross examination as to whether he felt that Petitioner was competent to be executed.

The Court next heard testimony from Dr. Daniel A. Martell, Ph.D. Dr. Martell also had an impressive curriculum vitae, and was accepted by this Court as an expert in psychology.

Dr. Martell testified that he had observed, interviewed and tested the Petitioner for approximately nine and one-half hours, seven hours on January 8, 2000, and an additional two and one-half hours on January 9, 2000. Five hours of this was spent observing Dr. Matthews' forensic psychiatric interview of Petitioner. In addition to examining Petitioner, Dr. Martell testified that he had reviewed many documents pertaining to Petitioner, which included the reports of the Petitioner's experts, reports from mental health doctors who had treated Petitioner in the past, records of Petitioner's personal history, and the transcripts from Petitioner's 1996 habeas corpus proceeding.

On direct examination, Dr. Martell testified that he had administered a battery of personality tests to petitioner, as well as conducted an oral interview. Dr. Martell stated that the results of several of the personality tests were invalid and could not be interpreted. Dr. Martell reported that upon his examination of Petitioner, Petitioner was oriented to the world around him, that he knew who he was, where he was, and knew the correct month and year, although he was unsure of the exact day of the month. Dr. Martell reported that Petitioner was "superficially cooperative" throughout both days of the examination, although he later found him to be malingering mental illness.

Dr. Martell reported that Petitioner was a poor personal historian, claiming to Dr. Martell to have a poor memory for significant facts and events in his life, including his criminal case. For example, Petitioner stated that he had his name tattooed on his arm because he could not, remember it, and he also claimed to have difficulty remembering his own birth date.

On the other hand, Dr. Martell reported that Petitioner was able to report in great detail other areas of his history, which included his abuse and that of his sisters at the hands of his father, his extensive history of drug abuse, and various details of his criminal case that he believes show him to be innocent.

Dr. Martell noted the same constant rhythmic tremors in Petitioner's feet, legs and fingers that the other doctors had noted.

Dr. Martell reported that Petitioner's thoughts were expressed in a coherent, goal-directed and logical fashion, although his thought content did appear paranoid at times. Dr. Martell reported that Petitioner had denied visual hallucinations to him, but had stated that he did sometimes experience both auditory and olfactory hallucinations.

In regard to his test results, Dr. Martell said the results indicated to him that Petitioner was malingering mental illness. Petitioner's cross examination of Dr. Martell in large part concentrated on the validity of the tests administered by Dr. Martell. In fact, Petitioner's counsel read out loud to the Court several of the questions from the various tests, and commented on their absurdity as far as their relevance to a man in Petitioner's situation. Dr. Martell did admit on cross examination that some of the questions designed to detect malingering on the various tests were inappropriate for a death row inmate, but maintained that

93. Id., page 830, lines 6–16.

the tests were valid tools generally accepted in the field of psychology to test for malingering. Dr. Martell also maintained that the Petitioner was exaggerating his symptoms or malingering.

This Court notes that much ado was made over the validity of the tests administered by Dr. Martell. Although far from dispositive as to Petitioner's competence to be executed, this Court found that the results did have some relevance in the proceedings. Furthermore, the Petitioner's own Court appointed expert, Dr. James Walker, had administered almost the exact same tests to Petitioner as had Dr. Martell, and Dr. Walker and Dr. Martell both testified that these tests are widely used and generally accepted as valid methods of testing in the psychological field. Therefore, this Court allowed the results to be entered into evidence in accordance with *Van Tran v. State, McDaniel v. CSX Transp., Inc.*, 955 S.W.2d 257 (Tenn.1997), and Tennessee Rules of Evidence 401 and 402. Additionally, as Dr. Martell stated in his report, the ultimate determination of Petitioner's competency for execution is a legal issue, not a mental health issue, and the ultimate question before this Court is not whether Petitioner is malingering mental illness, but rather, does Petitioner have the mental capacity to understand the fact of his impending execution and the reason for it.

In regard to Petitioner's capacity to understand the fact of his impending execution, Dr. Martell reported that Petitioner did understand that "they are going to kill me." Dr. Martell reported that Petitioner had informed him that the warden of River Bend had approached him and asked him to choose the method of his execution, and that he had chosen lethal injection. Petitioner further related to Dr. Martell that he had been offered Valium to sedate him prior to his execution, but that he had refused or planned to refuse. In regard to the refusal of Valium, Dr. Martell reported that Petitioner told him, "I think there might be a God, and I've got enough to deal with with him, without being drunk on Valium."

In regard to the reason for his impending execution, Dr. Martell reported that Petitioner was able to state that he had been sentenced to die for the murder of a young girl, although he couldn't remember her name, and stated he was not guilty of her murder. Dr. Martell further reported that Petitioner stated he had been arrested for murder, but claimed he had given a false confession, and attributed the crime to a man named Donald Gant. Petitioner further cited several pieces of evidence to Dr. Martell that he felt proved his innocence. Dr. Martell also referenced the fact that Petitioner is somewhat displeased with his lawyer's efforts to prove him crazy, rather than innocent.

Dr. Martell's final evaluation of Petitioner was that he is a manipulative and psychopathic individual, but that there was no evidence that he was psychotic at the time of his evaluation. Dr. Martell further opined that Petitioner was competent to be executed in accordance with the *Van Tran* standard.

At the conclusion of Dr. Martell's testimony, the state rested its case. In rebuttal, Petitioner called Dr. John Pruett, M.D., who was an attending physician at River Bend from 1994 to 1997. This Court found Dr. Pruett to be a competent and credible witness.

Dr. Pruett testified that in his time at River Bend, he had occasion to see Petitioner once every two to three months. On direct examination, Dr. Pruett testified, that DID was a legitimately recognized mental disorder, but that he had only seen one case of it. He further testified that the change in Petitioner's behavior witnessed by Dr. Kenner could be consistent with DID. However, when questioned about the many diagnoses given Petitioner, Dr. Pruett stated that while Petitioner's symptoms were consistent with the plethora of diagnoses, Petitioner's symptoms were also consistent with malingering.

On cross examination, Dr. Pruett testified that schizophrenia could not be diagnosed by the observation of brain structure alone, and that he most likely would not diagnose Petitioner with DID. Dr. Pruett did not render an opinion as to Petitioner's present mental competency to be executed.

Petitioner next called Dr. James Walker, whose report of his examination with Petitioner was referred to several times during the testimony of the other doctors. Dr. Walker is a licensed neuropsychologist, and this Court also found him to be a competent and credible witness.

Dr. Walker testified that he examined the Petitioner on December 23 and 24 of 1999. Dr. Walker stated that during his examination of Petitioner, he administered almost the exact battery of tests to Petitioner that Dr. Martell administered, as well as conducted a two to three hour interview.

Dr. Walker reported that Petitioner had given him an account of his childhood and the abuse he suffered at the hands of his father consistent to that given to other mental health professionals. Petitioner also reported his history of drug abuse to Dr. Walker. Dr. Walker reported that Petitioner's mental health records since 1996 reflect no clear indications of psychotic thinking or behavior, although the records do indicate consistent complaints of insomnia, anxiety, and urges to masturbate constantly. Dr. Walker reported that Petitioner has been written up innumerable times for public masturbation. In addition, Dr. Walker reported that Petitioner's prison records reflect an increase in complaints of anxiety and insomnia in the two weeks prior to his planned execution date of October 1999, although mental health workers at the prison noted that Petitioner continued to exhibit logical and coherent thought and clear speech.

Dr. Walker reported the following observations about Petitioner's behavior during his examination of him: He was alert and oriented to self, year, season, month, weekday, location and situation, but not date. He was markedly anxious, and psychomotor agitation was evident. Speech was fluent, and speech content reflected no delusions or obsessions. He did report unusual ideas, such as a belief in reincarnation. He used every opportunity during the interview to state his innocence of the crime for which he had been convicted, and to describe how he had been unfairly treated by the justice system.

Regarding the results of his testing of Petitioner, although Dr. Walker's results were similar to Dr. Martell's results, Dr. Walker testified that he did not feel that Petitioner was malingering, as malingering required some purpose or goal, and he could not detect any motivation of Petitioner to escape execution. Dr. Walker further stated that he did not believe Petitioner to be malingering because Petitioner denied any psychosis, took every opportunity to build himself up, and he felt Petitioner's behavior to be consistent with all mental health professionals.

When questioned about the various diagnoses given to Petitioner by the mental health experts in the present hearing, Dr. Walker stated that all of the diagnoses were reasonable, although he would not diagnose him as having DID. Dr. Walker testified that the Petitioner is not psychotic, but that schizotypal, antisocial, and narcissistic personality features were present. Dr. Walker further testified that Petitioner's tendency to lie could best be explained by a diagnosis of pseudologica fantastica, a condition that goes along with Borderline Personality Disorder, but which is not found in schizophrenics.

When questioned as to whether he felt Petitioner was competent to be executed in accordance with the *Van Tran* standard, Dr. Walker stated that he could not reach a conclusion on this, as competency to be executed was not his area of expertise. However, on cross examination, Dr. Walker did admit that in his report he states

that Petitioner is aware that his execution is pending. Dr. Walker further reported that Petitioner demonstrated a working knowledge of the legal system, including the roles of the judge, his attorneys, "and so forth." In addition, Dr. Walker reported that Petitioner retains memories of his trial and legal proceedings since his trial, and can explain many or most of the issues involved. Further, Petitioner is aware that he has been accused of a crime, and that the death penalty has been imposed for that crime. In sum, according to Dr. Walker's report, Petitioner has a basic understanding of his current situation and the capacity to act in his best interests if he chooses to do so.

When questioned about Dr. Kenner's assertion that Petitioner's mental state would deteriorate as his execution date approaches, Dr. Walker testified that he had questioned Petitioner closely about the future, going into unpleasant detail about his impending execution in an effort to test Petitioner's tolerance for imagining the details of his execution. Dr. Walker testified that he could elicit no concern on Petition-. er's part that he might deteriorate, nor could Dr. Walker observe any deterioration in response to his questions. Finally, Dr. Walker testified that a psychotic deterioration is not likely, but that it could not be definitively ruled out.

Although he did not testify in court, Dr. Herbert Meltzer submitted to this Court a report of his evaluation of Petitioner, conducted on December 23, 1999. Dr. Meltzer is a psychiatrist at the Psychiatric Hospital at Vanderbilt, whose studies center around schizophrenia. Dr. Meltzer was referred to several times throughout the course of the hearing, and all the medical experts spoke of Dr. Meltzer with great respect.

In Dr. Meltzer's report, he indicated that he utilized the mental health records of Petitioner dated 1975–1981, verbal communication with Dr. Walker, as well as Dr. Walker's written report, and the results of his oral interview with Petitioner. Dr. Meltzer did not take notes during his interview.

Dr. Meltzer reported that Petitioner's chief complaint to him was, "I know you are here to find out if I'm crazy so they can execute me. I am not crazy."

Dr. Meltzer reported that he observed the same constant tremors as had the other doctors, but that Petitioner was able to listen to his questions and make responsive comments, some of which were inappropriate, but most of which were to the point. He further reported that Petitioner exhibited no disorganization of speech, nor any bizarre delusions. To the contrary, Dr. Meltzer reported that considering the Petitioner's level of education and intelligence, he was remarkably lucid about his inner feelings and preferences.

Dr. Meltzer reported that Petitioner is aware that he is facing imminent execution for the crime of which he was convicted. He further reported that Petitioner does understand the nature of the crimes for which he was convicted, does not admit to guilt, believes he cannot obtain clemency or a new trial, and prefers to die rather than to live as he currently lives.

Dr. Meltzer reported that Petitioner did not currently meet the criteria for schizophrenia, and instead diagnosed Petitioner as suffering from generalized anxiety disorder, mild dementia or unknown etiology, compulsive masturbation, and possibly borderline personality disorder.

## CONCLUSION

It appears to this Court that Petitioner is suffering from some sort of personality disorder, as attested to by the majority of the mental health examiners. However, the ultimate question of whether the Petitioner is competent to be executed is a question of fact. *Van Tran,* 6 S.W.3d at 271; citing *Ford,* 477 U.S. at 412, 106 S.Ct. 2595 ("the ultimate decision will turn on the finding of a single fact..."). It appears to this Court that the single fact

most relevant to the determination of Petitioner's competency to be executed is the answer to the question of whether Petitioner lacks the mental capacity to understand the fact of his impending execution and the reason for it.

As noted in *Van Tran*, the burden of proof is on the Petitioner to prove his incompetence to be executed by a preponderance of the evidence. This Court finds that Petitioner has failed to overcome the presumption of competency by a preponderance of the evidence. In reaching its decision regarding Petitioner's present mental competency to be executed, this Court has taken into consideration the testimony of the court appointed experts for both the Petitioner and the State, the lay witness testimony, the behavior of the Petitioner during these proceedings, and the reports of the mental health experts submitted to this Court who did not testify.

Throughout all the testimony given, one fact has been constant; that Petitioner realizes he is facing execution, and that he knows it is because he has been convicted of murdering a little girl. Although he maintains his innocence, it has been made quite clear to this Court that Petitioner understands that he was found guilty of the murder and was sentenced to die. Furthermore, even in light of the myriad of mental health diagnoses given Petitioner, the fact that Petitioner knows he is facing execution for the murder of a young girl was reported by each and every mental health expert. In light of this fact, this Court has no choice but to find that Petitioner is competent to be executed, in accordance with the standard set forth in *Van Tran*.

Accordingly, this Court hereby finds that Petitioner is presently mentally competent to be executed. It is therefore **ORDERED, ADJUDGED AND DE-CREED** that Petitioner's PETITION TO PRO-HIBIT EXECUTION UNDER COMMON LAW, *FORD V.*

*WAINWRIGHT,* 477 U.S. 399, 106 S.CT. 2595, 91 L.ED.2D 335 (1986) AND THE TENNESSEE CONSTI-TUTION is hereby **DENIED.**

Entered this 2nd day of February, 2000.

BIRCH, Justice, dissenting.

In *Heck Van Tran v. State*,[1] a majority of this Court established the protocol that an inmate sentenced to death must follow to assert a common law and constitutional challenge to his or her competence to be executed. In the context of a Separate Concurring and Dissenting Opinion, I identified three components of the protocol which, when implemented, would each produce an unconstitutional result. Two are most significant: (1) use of the protocol would permit the execution of inmates who are, due to mental defect or disease, unable to consult with and assist their counsel; and (2) use of the protocol would deprive inmates of the right to have the ultimate issue—competence to be executed—determined by a jury of their peers.

Additionally, I provided what I deemed to be substantial and cogent support for concluding that these flaws in the protocol not only violate the Fourteenth Amendment and public standards of decency and propriety, but also compromise the integrity of the ultimate determination of competence. I adhere to those views.

Under different circumstances, I would concur with the majority opinion insofar as several relatively minor procedural issues are concerned. But such a concurrence is rendered meaningless in view of my already expressed disagreement with the methodology within which the procedural issues have arisen and upon which the validity of the trial court's (as well as the majority's) determinations of competence depend.

Thus, I am unwilling to approve of results reached through the use of a proce-

---

1. 6 S.W.3d 257, 274–77 (Tenn.1999).

dure with which I cannot agree. Accordingly, I would grant the stay of execution.